BERRIEN v. McLANE AND OTHERS.

A. was proven to have been the agent of a number of proprietors associated in the purchase of a tract of land for the purpose of collecting testimony and employing counsel. While a suit concerning the land was in progress, A. agreed with the complainant as was alleged in the bill, to allow him 640 acres for part of his compensation for his services.

*Held,* that whether the agreement was proven or not was immaterial, as an agreement to pay counsel a part of the property to be recovered, made pending the litigation, was void. Concluded from the cases examined, that a voluntary gift made while the connection of counsel and client exists is absolutely void, and the property can only be held as security for such charges as the party is lawfully entitled to make. A transfer made upon an ostensible valuable consideration is presumptively void. The client may require the attorney to show that the price or terms were as beneficial as could have been obtained from a stranger. A transfer of part of the property actually in litigation, or a contract to *transfer it is illegal, both on the ground of the relation of the* parties, and of the doctrine of champerty. It will not be enforced on behalf of the attorney; and if the client applies, will be cancelled on equitable terms. The rule applies to any such arrangement made during the suit, and the continuance of the connection whether the compensation is put on the ground of past services, or the consideration of future, or of both.

It is not sufficient to take the case out of this rule that the attorney had a share in the property in his own right. That would have prevented the doctrine of maintenance applying independent of the professional character, but does not affect the principles of the rule in the question.

An agreement made after the suit was determined, to allow the sum of $10,000, and a subsequent agreement to allow a certain quantity of land in substitution of the money as a final compensation, was held binding as against all the associates by whom it was admitted to have been made. But as to the others, *held,* that the general power to employ counsel did not authorize an agreement to remunerate them in land. Held also, that where the first agreement to pay the sum of $10,000 was admitted, the parties were bound, and their shares of the land, which by the articles were in the hands of trustees subject to legal claims, was decreed liable for the proportions. As to the associates who did not admit any agreement, an inquiry offered to establish it under the circumstances.

1840.

Berrien
v.
McLane and
others.

By the common law a trust devolves with the legal title upon the heir of the trustee. Our statute has expressly provided otherwise. The heir may refuse the office, or this court may be applied to to appoint a new trustee. But until this is done, the trust, except where our statute applies, follows the estate.

May 5, 6, 7.
June 8th.

*Mr. Butler* and *Mr. D. B. Ogden*, for complainant.

*Mr. Maxwell*, for the trustees and John Carnochan.

*Mr. Lord*, for trustees, B. W. Rogers and John Carnochan.

*Mr. Garr*, for Peter Mitchell and Colin Mitchell.

THE ASSISTANT VICE-CHANCELLOR :—The bill is against the trustees of the Apalachicola Land Company, and against the *cestuis que trust* for the purpose of enforcing two agreements alleged to have been made by their lawful agent, one for the transfer of $13,500 acres of land, and another of 640 acres.

The trustees deny the validity of the claims, averring that whatever agreement may have been made by Peter Mitchell, with Thomas Vermilya, or with the complainant, it was not made by him as the authorized agent of the Company. These trustees have issued certificates or scrip to numerous individuals, which they allege are in the hands of purchasers without notice of the complainant's claim. They probably represent these holders of scrip, and I shall assume that they are competent to represent them; so that there is no defect of parties.

The question as to the 640 acres may be disposed of without considering it in connection with the separate answers of the defendants. As to the claim for the 13,500 acres, a strict attention to the pleadings in relation to the defendants separately will be necessary, because some of them assent to the relief sought, fully, or to a modified extent. The effect of their submission and the contestation of the others will require consideration. But as the claim for the 640 acres may be disposed of upon the bill,

and the answer of Peter Mitchell, which is most favorable to the complainant, I shall examine it as if that answer was binding upon all on the question of Mitchell's power.

Assuming the allegations of the bill to be established, this case would be made out. That prior to the 8th of October, 1833, Vermilya, who had purchased a large interest in the property pending the proceedings, agreed in writing with the complainant, to allow as his proportion of the compensation for professional services, 640 acres That in October, 1833, Mitchell, the general agent of all concerned, agreed that the 640 acres should be a charge upon the whole of the land. At that time the appeal to the supreme court at Washington was pending.

I pass over the various other objections which have been taken against this claim, because the statement upon the bill itself is fatal to it. It is a contract made between a client and his counsel pending a litigation, to allow the latter a part of the land in controversy. I am of opinion that this agreement cannot be enforced in this court, unless it has been ratified after the termination of the suit.

The doctrine of the court as to gifts and agreements between a client and his advocate is one of great importance and utility. The learned author of the Commentaries on Equity, states the rule to be, " that on the one hand it is not " necessary to establish that there has been fraud or im- " position upon the client ; and on the other hand, it is not " necessarily void throughout *ipso facto*. But the burthen " of establishing its perfect fairness, adequacy, and equity, " is thrown upon the attorney." (1 *Comm.* § 312.) I apprehend that this statement of the doctrine, true as it is when applied to the great mass of gifts, contracts, or securities, is not applicable to the case of an agreement for a transfer of part of the property in litigation, made during that litigation. Such an agreement I hold to be utterly void, not merely presenting itself with suspicion attached to it, and calling for a jealous scrutiny ; but one incapable of being explained or sustained by any circumstances of adequacy or equity. The doctrine of the court applied to such a case depends not merely upon the gene-

1840.

Berrien
*v.*
McLane and
others.

ral principle springing from the relation of client and attorney, but from the transaction being affected by the law of champerty. The cases of *Proof* v. *Hines*, (*Cas. Temp. Talbot*, 111,) and *Powell* v. *Knowles*, (2 *Atk.* 222,) are clear upon the latter point.

And from a minute examination of the leading authorities, I deduce these positions as the existing law of the court. That a voluntary gift made while the connection of attorney and client subsists is absolutely void, and the property transferred by it can only be held as security for those charges which the attorney can legally make. Next, that a transfer of property made upon an ostensible valuable consideration, such as a lease or sale, is presumptively void ; the client has the advantage of driving the attorney to produce evidence to prove its fairness, and to show that the price or terms were as beneficial as could have been obtained from a stranger. And *lastly*, that a transfer of part of the property actually in litigation, or a contract to transfer a part is doubly void ; illegal because of the doctrine of champerty, as well as because of the existing relation of the parties : that such a contract will not be enforced on the application of the attorney ; and if the client applies will be cancelled on equitable terms. The cases of *Welles* v. *Middleton*, (1 *Cox. Ca.* 112,) and *Wood* v. *Downes*. (18 *Vesey*, 120,) and *Strachan* v. *Brander*, (1 *Eden*, 303,) sustain the first position. These decisions as well as the general principle, have been approved of by most eminent judges ; by Lord Erskine, (13 *Vesey*, 82. 12 *Vesey*, 372.) By Lord Manners, (1 *Ball & Beatty*, 96.) By Chancellor Kent, (6 *Johns. C. R.*, 248,) and by Chancellor Dessaussure, (4 *Dess.* 782.) The second position is established by the authority of *Harris* v. *Freemen*, (15 *Vesey*, 37.) *Gibson* v. *Jeyes*, (6 *Vesey*, 276.) *Hunter* v. ———, (3 *Mylne & Keene*, 11.) *Miles* v. *Ervin*, ( 1 *McCord's Ch. Rep.* 547,) and *Bibb* v. *Smith*, (1 *Dana's Rep.* 582.) And as to the last point, in addition to the cases of *Proof* v. *Hynes* and *Powell* v. *Knowles*, before mentioned, may be cited *Jones* v. *Thomas*, (2 *Younge & Collyer*, 498.) *Wood* v. *Downes*, (18 *Vesey*, 122.) *In the*

*matter of Bleachley,* (5 *Paige,* 313.) *Key* v. *Vattier,* (1 *Hammond's Rep.* 132.) *Thurston* v. *Perceval,* (1 *Pickering,* 415,) and *Rust* v. *Lane,* (4 *Little's Rep.* 413.)

In *Wood* v. *Downes,* a case from the Year Book, 13 Henry VII. 17, is cited, which is the foundation of the whole doctrine : " that though the giving part of the land " in suit, after the end of it, to a counsellor for his wages, " is not within the meaning of the act, if it evidently " appears that there was no kind of precedent bargain re- " lating to such a gift ; it seems dangerous to meddle with " any such gift, since it cannot but carry with it a strong " presumption of champerty." In the cases in Kentucky which I have cited, it has been settled that while this court will not execute a champerty contract, yet the counsel did not forfeit the right to a compensation for his services.

But several distinctions have been taken by counsel to clear the present contract from the operation of this doctrine. It is said there was no suit pending. There was a provision, however, in the act of congress, by which claims were to be examined in certain tribunals, and the United States resisted the claim, and if the resistance had been successful, would have held the land.

It is then urged, that it was in compensation of past services. But no such distinction can be admitted. No severance of compensation for past from future services, can be allowed, so long as the litigation is proceeding. Again, it is contended that a trustee cannot set up such a defence. It might be sufficient to say, that the trustee is here sustained by some of the parties interested, who make the same defence. But the answer may be more pointed. I consider that a trustee is entitled, if not absolutely bound, to take every objection, even of the most technical character, which the law will permit.

In the matter of the Life and Fire Insurance Company, the present chancellor held it incumbent upon receivers to raise the question of a violation of the restraining act, where if the parties claiming as creditors were defeated, the stockholders would take the funds ; and in *McEvers*

*In the margin:*

1840.

Berrien *v.* McLane and others.

v. *Lawrence*, I have held that receivers were bound to take the objection of a want of written notice of a fire having taken place under the provisions of a policy of insurance, where it was manifest the company had actual notice. So an executor may set up the statute of limitations against the most just demand, though the court will not compel him to do it. (*Shewen* v. *Vanderhost*, 1 *Russ. & Mylne*, 352.)

The next objection, however, is of more weight. It is urged that the plaintiff was the owner of two shares in the property when he made his contract. I pass over the point that this fact is in evidence without being alleged in the bill, nor in any one of the answers. It appears by exhibit No. 12, annexed to Carnochan's answer, that the plaintiff held originally two shares of 5,000 acres each, which was commuted for two lots of 400 acres each, with the privilege of selection ; and these commuted lots are mentioned in the account book produced, fol. 99. But assuming the fact to be properly before the court, it is insufficient to vary the case. It is true that it is not maintenance where the party aiding in the conduct of a suit has any legal or equitable interest in the subject matter. (*Wickham* v. *Concklin*, 8 *Johns. Rep.* 221. *Arden* v. *Paterson*, 5 *Johns. C. R.* 51. *Croke Eliz.* 582. *Noy*, 99.) Neither was the regular aid of counsel ever within the law of maintenance. But the question of champerty or such a contract as savors of it is widely different. No objection upon the ground of public policy and official influence, is removed or weakened by the fact, that the attorney has an individual interest in the property ; and such a case is as much within the letter of the statutes as within the spirit of the rule. The first act (1 Edw. I. c. 25,) was very explicit. "No officer of the king, &c., "shall maintain pleas or suits hanging in the king's "courts, for any lands or tenements or other things, for to "have part or profit thereof by covenant between them ;" (*Statutes at Large*, vol. i. p. 50,) and the language of our own statute is equally express.

One other consideration has occurred to me. It has been suggested whether since the Revised Statutes the

doctrine of champerty and maintenance is not abolished, except as to buying pretended titles.

The revisers state that they propose to abolish the law of maintenance, and to qualify that of champerty by permitting mortgages of land in dispute to be made. (*Notes*, vol. iii. p. 828. See 2 *R. S.* 732, § 148.) But the fifth section of the present statute (2 *R. S.* 691,) is as strong upon the case before me as the old law. It perhaps may be that a contract to give part of the land in suit made by the party in possession will be valid. It is to be regretted if such shall be the construction of the statute ; and it was a case shut out by the former law. (See 1 *R. L.* 172, § 1.)

It appears by the answer of Vermilya, that his agreement to allow the 640 acres to the complainant was made in the city of New-York, and in pursuance of such agreement he handed a written contract to the complainant in Washington on the 11th of February, 1834. And he also states that the agreement between him and Peter Mitchell, was made in New-York in October, 1833. Thus the place of the contract seems also fixed in New-York. But if it can be regarded as being made in Washington, the conclusion must be the same. If the common law prevails in the District of Columbia, there is ground to hold that the doctrine in question is one of the common law, independent of statutory provisions. (*Bringly* v. *Whiting*, 5 *Pickering*, 349. *Rust* v. *Lane*, 4 *Little's Rep.* 413.) If the common law does not prevail, nor any statute upon the subject is in force, yet the court in this state is asked to enforce a contract which is in violation of a public law of the state. (*Story on the Conflict of Laws*, p. 203—215, *Kent's Commentaries*, vol. ii. p. 458.)

It is however contended that the agreement was fully ratified and confirmed by the articles of association and the other acts of the proprietors and directors. Passing over the question, how far a subsequent confirmation can give validity to a contract impeachable as a violation of a public statute, it is manifest that there never was that explicit and perfect ratification which is always required.

1840.

Berrien
*v.*
McLane and
others.

(*Story's Eq.* vol. i. § 307. *Malony* v. *Le Strange*, 1 *Beatty*, 413.) It is left open upon the articles of association and lists annexed. A commutation is indeed offered, which not being accepted, cannot affect the right of contesting it; and the directors ultimately express an opinion that it ought not to be allowed.

From these considerations I come clearly to the conclusion that the claim for the 640 acres cannot be sustained in this court, even if free from every difficulty as to the authority of the agent. And I am glad to assert a great and beneficial principle in a case in which the standing of the advocate and the greatness of his efforts render its application signal. The warm eulogy of his counsel was no doubt deserved. The services were arduous—the ability consummate—and the success complete. These are influences to tempt us to bend the principle; and when in spite of them it is sustained, it receives fresh vigor.

But all the authorities admit, that after the connection between client and counsel is at an end; when the pressure of influence and the dread of injury are removed, a gift or a contract will be unimpeachable. The court is not then to regard it with scrupulous suspicion, nor compare its amount with any appreciation it can make of services. The moment it is ascertained that the relation is finally closed, gratitude may be munificent, or even prodigal. But we must clearly see that the bounty springs from unfettered gratitude, not from previous entanglement; that it is a freewill offering for difficulties overcome, not the fulfilment of a vow extorted in peril.

II. Testing the next subject of the plaintiff's claim, viz: that for the 13,500 acres, by these principles, I do not find any thing to impeach it. It appears to me exempt from any circumstance which can prejudice it on these grounds.

As I have before observed, the case must be examined with respect to the defendants separately. I shall take it up as it relates to John Carnochan, and those claiming under him, in the first place.

The allegation of the bill is that after the final termina of the cause, in consideration of the time spent and services

rendered by the complainant, Peter Mitchell, as general agent of the proprietors, and with the written assent of Carnochan, agreed to allow the complainant for his further and final compensation, an undivided interest to the extent of 13,500 acres. In proof of this allegation is exhibited an agreement in the form of a letter, signed by Peter Mitchell, describing himself agent for the proprietors, and trustee of Carnochan and Mitchell, and by John Carnochan. In this they say that, " as a further and final compensation " for your services in prosecuting the general claim of " Forbes' purchase to a final decree, we agree that you " shall be allowed 13,500 acres undivided interest in the " said land." It is to be noticed that the complainant had written to Colin and Peter Mitchell, and Thomas Vermilya on the 19th of March, 1835, calling upon them to look into the question of his compensation, and to exercise a deliberate judgment upon it. The letter is dated the 22d July, 1835, and on the same day they sign an order as follows : " The trustees and company composing the " Apalachicola Land Company, in the execution of the " agreements made, are hereby requested to issue to the " order of J. McPherson Berrien, certificates of stock in the " said land to the amount of 13,500 acres."

Carnochan admits the signature of these papers ; but he says that he signed this agreement of July in ignorance of the agreement of August and October, 1833. This allegation is entirely without foundation. By that agreement the complainant was to receive 800 acres. It was signed in Savannah by Mitchell, in August ; and ratified by Vermilya in New-York, in October. Passing by every other circumstance which renders such ignorance improbable, the book produced in evidence is decisive. It contains a particular statement of the " land contributed " to the lawyers, for maintaining the title against the " United States," and in this is put down to Judge Berrien the two lots of 800 acres each, to be selected, making the whole to him 2760 acres. This entry must have been made, of course, after August, 1833. It does not appear when it was made, but from an inspection of the book, I

judge it to have been done between that time and March 1834. The testimony, that of Williamson in particular, leaves no room for doubt that this book was actually and often inspected by Carnochan.

I find no other objection raised by Carnochan to the effect of these papers, except his insisting that Peter Mitchell was not the general agent, and could not bind the proprietors. But I look upon it as very clear, that these papers in the first place contain the express and voluntary agreement of Carnochan to the allowance; and next, his recognition of Mitchell as general agent. When he unites in signing two instruments, distinctly asserting the character of Mitchell, he must show at least some strong circumstances to avoid the conclusion that he treated Mitchell as entitled to it.

But this does not establish agency, except as to Carnochan. And as to him it is probably immaterial in another view of the effect of his signature. His own signature binds him to ratify the allowance. But how far it binds claimants under him, is another question.

It seems that the defendant Carnochan and Peter Mitchell were partners, and interested in the tract in question; that Octavius Mitchell held their interest as trustee, and with them conveyed it to Robert Mitchell. Robert Mitchell died, having appointed Peter Mitchell his executor. Chancellor Kent gave an opinion that Peter Mitchell could not act as executor in the trust created by Carnochan and Mitchell; but that until a court of equity interfered, there was a resulting trust thrown back upon the original owners. These were the defendants Carnochan, and Peter Mitchell; that each had equal control, and that they were to be held trustees for the creditors. This opinion was dated November 27th, 1835.

If the view taken by that learned jurist is right, the agreement in question was binding upon Carnochan and Mitchell personally; upon the creditors whom they then represented; and for reasons hereafter to be stated, upon all who could claim under them. I do not now stop to inquire how far the agreement was controlled by sub-

sequent events. But I am clear in the opinion that it amounted to an instrument recognizing Mitchell as the agent, and expressly assenting to the allowance out of the general fund.

But is it the law that upon the death of a sole trustee, any power of control over the property, the subject of the trust reverts to its creator? It is admitted in the opinion, that the legal estate devolved upon the heirs at law of Robert Mitchell, the trustee. Peter Mitchell was one of them; but there were others, and it is observed that one heir cannot act alone in the trust. The proposition strikes me (and it is spoken with the reverence which a professional education at the foot of this great doctor of the law has inspired,) as entirely without foundation. Nothing is more clear, than that a trust devolves with the legal title upon the heir at law of a deceased trustee. " If a " feoffee die, his heir shall be subject to the trust," was stated in a case as ancient as the 14th of Henry VII., (*Fitzherbert* v. *Cook*, Lord Ellesmere's office of Chancellor, p. 94.) " I take it," says Chief Justice Wilmot, " to be a " first and fundamental principle in equity, that the trust " follows the legal estate wheresoever it goes, except it " comes into the hands of a purchaser for valuable con- " sideration, without notice. I never heard any distinction " made, nor has any case been cited to prove that a trust " fit and proper to be executed against a trustee, should be " suffered to fall to the ground and remain unexecuted " against an heir at law, where there was no trustee. The " lapse of the legal estate has never the least influence upon " the trusts to which it is subject." (*Attorney-General* v *Lady Downing*, *Wilmot's Opinions*, 21.) It is needless to quote more of this great opinion. There are other parts of it illustrative of the same doctrine. See further, *Lord Grenville* v. *Blyth*, (16 *Vesey*, 231,) and our own statute of trusts, prescribing that a trust estate shall not descend to an heir.

Now if the heir of a trustee takes the land clothed with and subject to the trust, there is no incapacity to execute it, and he may be called upon to do so. The terms of

the grant in trust deeds, confer in almost every case in terms, the like power upon heirs and assigns, as upon the trustee; and hence the frequency of powers reserved to appoint a new trustee upon the death or incapacity of those named. This dispenses with the necessity of a resort to the court of chancery. (*Willis on Trustees*, 144, 145. *Levin on Trusts and Trustees*, 465,597. *Devy* v. *Peace*, *Tamlyn's Rep.* 77.) There is no doubt of the right of the heir to refuse the office, and no doubt of the right of this court, whenever a trust exists and the trustee fails, to appoint one to execute it. (*Denyer* v. *Drece, Tamlyn's Rep.* 37. *Attorney-General* v. *Stephens,* 3 *Mylne & Keene*, 47.) But without a renunciation, and before a new appointment, I apprehend the heir is invested with the trust. The case of *The Attorney-General* v. *The Bishop of Litchfield*, (5 *Vesey*, 824,) appears to me decisive. There a presentation had been made by the heir at law of a surviving trustee, which was held valid.

I conclude therefore that no right or control over the property devolved upon J. Carnochan or Peter Mitchell, as original owners by reason of the death of Robert Mitchell. This view causes me much embarrassment in sustaining the claim. The bill states that Robert Mitchell claimed and represented himself to be the authorized agent of all interested in the land with the exception of William Christie. That he made a contract with the complainant for his compensation, and died in December, 1830. Then that Peter Mitchell was appointed general agent of the persons interested. But as relates to the share of the property now considered—the original share of Carnochan and Mitchell—who could appoint him? Either the heirs at law of Robert Mitchell, or all the *cestuis que trust* under their deed of trust. The power of appointment could possibly exist in no other person. The legal estate was in the heirs. The power of control, until the interposition of this court, was in them; the beneficial right was in the *cestuis que trust*, the creditors. Their appointment might avail without that of the heirs, who were trustees by operation of law. But there is no evidence of the appoint-

1840.

Berrien
*v.*
McLane and
others.

ment by either of the parties entitled to make it; and when a party claims a right by virtue of the act of an agent, he must prove the existence and adequacy of the power of that agent, when it is formally denied.

This argument has pressed upon me much. There appear, however, several answers to it. It is undeniable that through these transactions Peter Mitchell alone, or in connection with Carnochan, acted as the trustee of the firm. In the first place, if, as I gather from the statements, the will of Robert Mitchell gave his estate generally to his executors, it most probably would pass the trust. (*Marlow* v. *Smith*, 2 *P: Wms.* 201. *Attorney-General* v. *Buller*, 5 *Vesey*, 340. *Braybooke* v. *Inskeep*, 8 *Vesey*, 437.)

Again, it was strongly insisted upon in the argument of the cause before the supreme court, that the claim was one of a merely equitable, not a legal estate. The opinion of Justice Baldwin does not contradict the position. If this were the case, then by analogy to a trust of personalty it devolved upon the testamentary executor, not upon the heir. (*Willis on Trustees*, 53.) Carnochan admits in his answer that Peter Mitchell was the executor.

But lastly I have extended my observations upon the supposition of facts being in the case which are not in strictness before me. If we revert with precision to the pleadings and testimony, we find an issue raised whether Peter Mitchell was trustee of the estate of Carnochan and Mitchell. We find the answer of Carnochan affirming that Robert Mitchell acted as trustee of the creditors; that upon his death, Peter assumed to act as sole trustee; that he, Carnochan, insisted on his right to act as joint trustee, which right was finally admitted; that he has been recognized by all the parties as such joint trustee; that the legal character of Peter Mitchell was as executor of Robert, and as trustee jointly with the defendant. In support of all this, we find the articles of association signed by all, expressly recognizing Peter Mitchell as executor of Robert, and *trustee* of Carnochan and Mitchell. We find each of them signing as such trustee. The schedule No. 3, is

Vol. I.                55

1840.

Berrien
v.
McLane and
others.

signed, "Peter Mitchell, trustee of Carnochan and Mit-
"chell ; John Carnochan, joint trustee of Carnochan and
"Mitchell." The 8th subdivision of the 2d article of
that schedule or supplement awards $14,000 to Peter
Mitchell, as trustee of the firm.

After all this, it is impossible to avoid the conclusion that
as between the parties to this suit, and upon all the facts
presented to me, I must conclude that Peter Mitchell alone,
or together with Carnochan, stood as the lawful trustees of
those entitled under the original transfer for the benefit of
their creditors. Peter Mitchell himself insists upon his
right as such, and the creditors may be assumed after so
great a lapse of time, and so notorious an exercise of a
trustee's power, to have sanctioned it.

Without then entering upon the point of Mitchell's
agency, I find that these legal representatives of eighty-
four shares, and Peter Mitchell representing sixteen and
one third shares as executor of Robert Mitchell, have ex-
pressly authorized the compensation now claimed.

And it is also clear in my opinion, that whatever was
the operation of the agreement as to Mitchell and Carno-
chan themselves, or their creditors, or the estate of Robert
Mitchell, the effect is the same as to every person subse-
quently acquiring an interest in the property derived from
them or either of them.

The article of association expressly recognize the trust
for these, as well as the other parties, and their respective
shares. The fifteenth article expressly provides for the
ratification of all contracts for compensation made by
Peter Mitchell as executor of Robert, and as trustee of
Carnochan and Mitchell. The land which was then
divided into 240 shares was to be apportioned in 2400
shares, and scrip to be issued to each proprietor in propor-
tion to the interest conveyed by him to the trustees.
When this was done, the scrip now held by any third
person and derived from these parties, was taken with full
constructive notice of the articles ; and both by the
fifteenth section and the schedules, he was apprized that

it actually was subject to a lien for any valid contracts made by the parties from whom he acquired his right.

Here an important question arises. It may be strongly urged that the two papers signed in July amount only to an agreement that the allowance was to be made out of the common fund. That they formed a mere conditional agreement, to be wholly inoperative in case it could not affect the common fund. I again call to mind that I am examining the case entirely irrespective of the question of general agency.

The letter does not in terms refer to the common fund, but is an agreement that the complainant shall be allowed the specified number of acres as his final compensation. The order requests the trustees to issue certificates. Now, if the other proprietors had assented to the allowance, the shares of these parties would have borne their proportion only of the claim ; and hence it is clearly against the spirit of the engagement to charge the whole upon their proportions. But if these shares are subjected only to the amount which they would necessarily have borne had the full ratification taken place, the same result is obtained which the parties intended and anticipated. There is then nothing inequitable or unjust to these individual holders, or those claiming under them, to give such an operation to the contract ; and the question is, whether the terms of the contract preclude such a construction, or fairly show that it was not meant.

Suppose the case of three partners, and after dissolution, a binding recognition by one of a claim as a partnership debt ; but which cannot be established against the third. The recognition is valid as to the one. (See *Brisban* v. *Boyd*, 4 *Paige*, 17.) And certainly if the engagement was accompanied with a lien upon specific partnership property, it would avail to the extent of that partner's interest.

Again, in the case of tenants in common, if a sale is made or a lien created by one professing to have the whole estate, or as able to bind the other, undoubtedly the purchaser or incumbrancer may enforce the agreement or

1840.

Berrien
v.
McLane and
others.

lien as to the share actually owned, with an abatement of his purchase money where it is a sale. Indeed it has been held that in case of such a sale, the other tenant in common may adopt the contract, and file a bill against the purchaser for performance, and for his part of the purchase money. (*Pollard* v. *Coleman*, 4 *Call.* 245.)

It may be that an action at law could not in this instance be sustained. That such a suit must proceed for the whole quantity of acres. But in this court a separation can be made. The consideration is divisible. The benefit reaped by the party's share of the property is precisely in proportion to that share; precisely that amount which by the agreement they admit their share should bear, when they admit that the fund at large should bear the whole compensation. I am satisfied that this is the just, and equally satisfied that it is the legal principle, upon which to proceed.

If then it rested solely upon these papers, the shares in question would be responsible. But in ratification of this agreement, the articles of association signed by Peter Mitchell and Carnochan, provide that agreements for compensation of counsel fees made by Colin Mitchell, Peter Mitchell, in the character of executor of Robert Mitchell, and trustee of Carnochan and Mitchell, Benjamin W. Rogers, and Thomas Vermilya, are to be regarded as binding and obligatory. The construction put upon this article, that it relates only to contracts signed by all the parties named, is wholly inadmissible. It could not have been designed, when it was notorious there did not exist such a contract, and if designed, it must fail. The words admit of another interpretation, and that justice requires. It is to be read as if the disjunctive *or* had been used. Now, whatever may be the argument as to the others, the parties in question had made an express agreement, signed in the designated capacity; and I view it as the renewal of the engagement on their part, that the whole fund should bear the charge; and by inference, an agreement, that at all events their shares should bear the due proportion.

It need scarcely be remarked, that when Peter Mitchell

signed under the assumption of the character of a general agent, his act was at least binding upon him as executor of Robert Mitchell.

I shall next take up the answer of the defendant Rogers, because he assumes the strongest ground adverse to the complainant. In his answer he presents the issue upon the fact of any agency at all in Peter Mitchell, even to engage and compensate counsel; insisting that all such contracts were to be ratified by the co-proprietors. He insists that there never was, or was intended to be, a ratification of the agreement as to the 13,500 acres; but that it was presented, urged, and the allowance refused, by himself and by the directors. He avers in confirmation of his understanding of the extent of Mitchell's power, that the first contract made by Robert Mitchell, in 1828, was ratified by him, in pursuance of a form sent him by Peter Mitchell, in September, 1829.

The first important point upon the issue raised by this answer, is the construction of the articles of association, and the lists annexed. This has been the subject of great debate. I have already expressed the opinion, that the meaning attempted to be put upon it, that it relates only to contracts signed by all the parties named, is not its true meaning. It is to be regarded as in the disjunctive. Hence, a contract signed by either of the parties, and by those whose particular capacities are indicated in such capacities, is binding. The article does not comprise contracts signed by Mitchell as agent; but it does such as are made by him as trustee of Carnochan and Mitchell. The agreement in question is then within its letter.

Next—I am satisfied that the claims for compensation which are recognized, are recognized as chargeable upon the general fund. The language of the 15th section is not very explicit upon this point, and may admit of the meaning that the agreements were to be fulfilled by the trustees out of the particular shares of the parties making them. But when coupled with the first section, and the fact that the agreements specified in the lists, and which are allowed to

1840.

Berrien
*v.*
McLane and
others.

be paid out of such fund, are agreememts made by Mitchell as trustee, and by Vermilya, all doubt must be removed.

Again—The lists which are spoken of in the fifteenth section as furnished, but which were not completed for several days afterwards, are to be deemed part of the section, and to be resorted to for its exposition. I am far from saying that the omission in the list of a claim under a contract clearly within the section, can prejudice the claim. But this I hold—that he who founds himself upon the section, must admit the list as a part of it; and that must have its due operation. If the list plainly excludes a demand, which the general words would sustain, the demand must be rejected. If it restricts the general words, so as to leave the demand unsanctioned, it must be allowed that operation.

Examining the document by these rules, we find that claims of various counsel are allowed, and are put down under the fourth article as follows : " As regards the re- " serves alluded to in the trust deed, they are of two " classes—the first being original reserves or deductions " from the purchase;" then specifying them. " The second " class consists of cessions made after the purchase," and under this head the allowance to a claim of the present complainants is as follows :

"To John McPherson Berrien.

" 6 lots of the Little River survey, of 400 acres each, " No. 47, 52, 57, 62, 13 and 17,—2,400 acres.

" One lot on the Welhula survey, No. 18,—360 acres.

" To be charged to the proprietors generally.

" A claim for additional compensation."

The allowance agreed upon by the contract signed by Mitchell in July, and by Vermilya in October, 1837, is thus expressly adopted. The contract in question is re- ferred to, and not adopted. I rather think that the phrase " to be charged to the common fund," refers to the previous items, not the additional compensation. But I will assume that it is to be connected with the subsequent clause. The specific claim in question was at that time known to all the parties, its extent, and the evidence of it. It is put

down then as a demand, not as in the preceding instances, as a fixed liability.

There can be but two constructions placed upon these words—First, that they imply (connecting the preceding clause with them,) that the complainant made claim for the additional compensation specified in the papers of July, 1835, which if sustained will be a charge on the general fund—Or, second, that he had such a claim generally, without referring to this specific ground of it; and if that was established it would be a general charge.

But in neither view can the statement in the list, nor that coupled with the fifteenth section, amount to a recognition of the liability. In either case the question of liability is left open, and on the latter supposition, both the amount and liability is left undefined.

Thus although the claim is fully within the scope of the fifteenth section of the articles, yet the list, by adopting a claim resting on the same ground, and pointedly omitting to adopt this, precludes the operation of the section. The right must be sustained upon other evidence. And this brings us to the question of Mitchell's authority to bind the proprietors.

The agreement is signed by him as agent as well as trustee.

Upon the answer now considered, as well as upon that of the trustees, the issue is raised whether the agency of Mitchell, which it is admitted he had to some extent, empowered him to bind the owners for a transfer of land. Such an agency it is undeniable may be constituted by parol. In Georgia the *Statute of Frauds*, 27 *Car.* II., is in force, (*Laws Georgia, Revision*, 1820, p. 310 and 560,) and such is the settled construction of that statute. (*Sugden's Law Vendors*, p. 104, 9th ed.) It is equally clear that very unlimited general words used in conferring a power will be restricted to a specified object of the power. (*Hay* v. *Goldsmidt*, 1 *Taunt.* 349. *Story on Agency*, 58—63.)

In the present case there is neither written authority, nor parol evidence of a direct bestowal of such a power.

I take it to be fully in evidence that he was the agent for the purpose of managing the cause, collecting testimony and employing counsel. In the latter capacity his retainer would be binding, and his principals would be liable for the ordinary counsel fees. I have no hesitation, however, in saying that such a general authority cannot bind them to a remuneration in land.

Hence there must be either an express authority for that purpose, or a subsequent recognition.

The testimony in the present cause is either of general reputation or of acts supposed to amount to acknowledgment or ratification. After carefully examining the former, I dismiss it with the observation that it proves satisfactorily an agency to a large extent, for the collection of testimony, employing of counsel, and rendering other services, but it does not prove or lead to the inference of a power to convey land.

All the other testimony I believe is this. The defendant Rogers, in a letter dated the 13th April, 1832, and written to Peter Mitchell, says :—" The lawyers require " heavy sums to make them move. In addition to the " cash payments, they are to have slices of the terra firma. " Well, I suppose there is no help for it. You and Mr. " Colin Mitchell will of course spend and give away no " more than is necessary for accomplishing the business ; " and if it is well done, it must be generously paid for."

He admits and sanctions by signing the articles of association and list, a contract which Mitchell had signed individually and as trustee, for the transfer of a given portion of the land to the complainant, viz : the agreement of August, 1833. This instrument recites an agreement that Berrien, in consideration of his services, should receive two other lots of 400 acres each, after specifying the previous cessions to him. This is first signed by Mitchell as trustee, and next " Peter Mitchell," without any designation. He may have meant to sign as agent, or as executor of Robert. The latter is the natural construction, especially as the parties are described in it as proprietors of the tract.

Now, if we bring together this document the articles and the list, we find an agreement by the first section that certain portions of the tract reserved are confirmed; that in such reservations are comprised a class of cessions among which are the lots included in this agreement of August, 1833, with a change of some of the numbers. (See the fourth article of the list.) We find by the 15th section of the articles, that the contracts of Peter Mitchell, as executor of Robert, and as trustee, are held obligatory; and the instrument in question is signed as trustee, and as I conclude as executor. In all this there is no recognition of Mitchell as an authorized general agent for this purpose.

Again, in the second article of the first list, are enumerated various debts to counsel and others, as " expenses " incurred in prosecuting the suit, and protecting the pro- " perty not heretofore included in any account presented by " Peter Mitchell *as general agent;* a part of these expenses " unpaid." Then follow a number of pecuniary claims, as, " To Daniel Webster, $2000, and for additional compensa- "tion." " To Andrew S. Garr, $1000." This cannot be carried further than to establish what is not controverted, that Mitchell was an agent to carry on the suit, collect testimony, employ counsel, &c. The question, whether his agency entitled him to agree to transfer land still remains.

Again, among these reservations are parcels allowed to other counsel. That to Joseph M. White was in part under his original contract with Colin Mitchell and Richard Carnochan, and so within the express words of the fifteenth section, and in part it seems a direct gift for services. At least I find no prior agreement stated as to the 600 acres and the 1200 acres. The cession to David B. Ogden was under an express contract with Vermilya, also within the fifteenth section.

Again, the book of accounts is referred to upon this subject. It is, with the fact of its being Mitchell's book, a decisive piece of evidence of an agency, and one of a large character. But there is nothing in it establishing the power in question. The entry at folio 99 is not sufficient for this purpose. All the agreements mentioned in it

except that for 640 acres, are agreements made by Robert or Colin Mitchell, or Peter as trustee, or by Vermilya. And that for 640 acres would appear in the book, if meant to be stated merely as a contract of Vermilya, as well as the item of 1200 acres to Ogden. After a careful consideration of all these circumstances, I cannot find enough to justify the position that Mitchell was authorized by Rogers, to agree for a transfer of land to counsel or others in remuneration of their services. The letter of this defendant is the strongest piece of evidence; but it is to be noticed that at its date there was no agreement except that made by Robert Mitchell as to compensation in land, and the defendant says he had ratified that, insisting that such ratification was essential. His letter then may fairly be referred to this agreement, and not as recognizing a general authority.

But there is most ample proof against this defendant, of an agency to employ counsel and to pay and allow them fees in the usual manner. In his letter of April 13th, 1832, he says : " I have looked over the statement of expendi-" tures, amount $43,203 12. Interest, $29,081 61—" $72,292 73. Of the particulars, of course I know "nothing, and have no doubt of their correctness." In the preceding part of this letter we find this statement. " Your account with me I have overlooked, by which you " make due from me a balance of $250 54." Now, by examining the book of accounts produced, we find (folio 38,) that this is the  exactbalance of Mr. Rogers' account on the 1st January, 1832.

We also find in the same book, (folio 53,) a statement making the sum of $43,203 12, due for principal of the expenditures, and $29,089 61, for interest, which corresponds precisely with the sums spoken of in Mr. Rogers'. letter. And we find several charges for monies paid to counsel for advice or services, as $300 to Messrs. Harris, Bullock, and Berrien the first item; fees on entering the appeal, $1,200, &c.

This proves to my mind, conclusively, that Mitchell was the recognized agent of this defendant, authorized by

him to engage counsel, and to pay their fees in the usual manner, but not entitled as such agent to bind him for a transfer of land.

1840

Berrien
v.
McLane and
others.

The agency being established to this extent, by testimony, independent of Mitchell's declarations, he could have been called to prove the contract for $10,000. He has not been examined, but in his answer, if that may be resorted to, he says he allowed the 13,500 acres as a compensation for the sum of $10,000 before agreed to be allowed upon the termination of the suit. Now, the general authority to employ counsel and bind the principal for their payment, is established. The agent makes a written paper, stipulating compensation in land, which is without the scope of his authority. The principal repudiates the contract. The agent says it was in commutation of money agreed upon. Under such circumstances I incline to think that his declaration to this effect is legal testimony. (See 1 *Phillips*, 401, American edition.) The question as to its admissibility, is not free from difficulty. No doubt he might have been called as a witness, and by either party to this point. It is a statement made after the agreement, and if the strict rule is that such admissions are only receivable when there is an express authority to make them, it will be difficult to support this. But Sir William Grant's position, more relied upon than any authority in the books, is, that they are admissible when made at the time of the agreement, or when acting within the scope of the authority. (*Fairlie* v. *Hastings*, 10 *Vesey*, 128. See the cases collected in *Philips on Evidence*, Boston edition, 1839, vol. i. p. 363; English paging, 402.) At any rate, the complainant stands before the court, making a claim for additional compensation, and the existence of that claim is known actually or by necessary construction, to every person interested in the fund. If it is not liquidated by the agent's admission as to any parties, a reference or action would be allowed to settle the amount, and the evidence of the agent would then be available. The bill and injunction would be retained until the decision upon such an inquiry. The property in the hands of the trustees

is chargeable with whatever the complainant can establish should be allowed for additional compensation, either by express agreement, or upon valuation. I must, perhaps, if either party demand it, take this course as to Rogers, and the claimants under Vermilya.

Upon the whole I consider that the defendant Rogers is bound to allow and pay his proportion of this amount if he reject the claim for the equivalent, and although I have hesitated whether relief as to the money payment could be had under this bill, yet I am satisfied it is within the power and is the duty of the court to do so by retaining the injunction until satisfaction is made. The views I have taken may be thus summarily stated. The claim in question rests either upon the ground of its being a contract made by Peter Mitchell as trustee of Carnochan and Mitchell adopted by the articles of association, or it rests upon a contract made by him as the authorized agent of the proprietors.

As to the former the claim has not been recognized or adopted by those articles, so as to be obligatory. There of course is no pretence that a contract of Mitchell, as trustee or executor, bound the other parties *ex proprio vigore*. It is to be rendered binding by the articles and lists, or by other acts of adoption if such exist. The former are insufficient, and none other appear.

As to the latter ground my conclusion is, that there is no sufficient testimony to establish an authority in Mitchell to make a contract for compensation in land. That however there is clear proof of an authority to employ counsel and allow them a money compensation in the usual manner. That this was done in the present case, and $10,000 agreed upon, and that the defendant must bear his proportion of that sum.(a)

The claim as to Colin Mitchell is next to be considered. He was a proprietor originally to the amount of forty-

---

(a) In *Ross's Ex.* v. *Davies,* (4 *J. J. Marshall,* 386,) it was held that an authority to employ a lawyer, and pay him money, does not authorize a written agreement to pay part in land.

six and two thirds shares, and these I infer still belong to him, or a part of them. Mitchell in his answer admits " that upon the death of Robert Mitchell, Peter Mitchell " *became and acted, as he understood and believes, as the* " *general agent of the persons interested in the claim,* " and took upon himself, as he has been informed and be- " lieves with the consent of all the other parties in inte- " rest, the management and direction of the cause in the " supreme court." Again, " that he has understood and " believes that after the termination of the cause, Peter " Mitchell, as general agent of the said proprietors, agreed to " allow him as a further and final compensation $10,000— " that they subsequently took upon themselves to com- " mute this allowance for the 13,500 acres of land, and " that Peter Mitchell, acting as general agent aforesaid, " drew the order upon the trustees as stated in the bill." He admits that it was then in contemplation to appoint trustees. He however submits that Mitchell and Carnochan had no right, except as individually concerned, *to change the compensation from money to land,* and that their agreement so to do is not binding upon him and the other proprietors.

Again, he says, that as to himself he did consider that the complainant rendered his services for the benefit of all the proprietors, and not for any one of them individually, and that he admits that Mitchell acted as agent for the purpose of carrying on the suit, and as such agent did carry on the same, and that the conduct of it was confided to him, but he submits whether as such agent he had power to bind the proprietors to the contract in question. At the close of his answer, however, he insists that the claim should be borne by Peter Mitchell and John Carnochan, or their shares of the property exclusively. Upon these admissions of the defendant's answer there can be little doubt of his responsibility. He admits a general agency ; that the services were rendered for the general good, and that as the general agent, Mitchell agreed to allow $10,000. He contests the right of commutation. I look upon the answer, considering all its admissions and

1840.

Berrien
*v.*
McLane and
others.

averments as presenting the case of an admitted binding contract made by the defendant's agent to pay $10,000 for counsel fees, and to bear his share of it, and as raising the question that such agent had no right to change the money allowance to one for land. And upon the subject of the agency of Mitchell, so far as a right to employ counsel and pay or allow their fees in the usual mode, the book produced is decisive. A statement is made in it (page 67,) of expenditures in support of the title, among which are several sums paid to counsel for fees, as $1,200 to Berrien and White, May, 1828, and Colin Mitchell signs an admission of the statement being correct, (fol. 71.) The view I have taken of the case in the examination of Rogers' defence settles the claim as to this defendant. He must be held responsible for his share of the $10,000.

I do not gather from the pleadings or proofs whether the defendant White has an interest in the property as a proprietor, upon whom any portion of an allowed charge must fall. If so, however, his answer raises the point distinctly, that Mitchell had no power to bind the lands for remuneration of counsel. It does not admit distinctly an authority to employ counsel. But I am of opinion that even against this defendant the proof is sufficient for that purpose, although I confess it is less strong than against Rogers or Colin Mitchell.

The answer of Thomas Vermilya, is next to be examined.

The admission of a general agency in Peter Mitchell is sufficient to have bound this defendant to allow the claim in question. It is true he may be regarding as coupling it with a condition that the assumption of his own agreement for 640 acres should be recognized. But as that was not binding even on him, I should feel justified in adopting the admission, rejecting the condition. He also admits that the 13,500 acres were allowed in commutation of a prior agreement to allow $10,000.

But Vermilya states that he has sold his stock, and has little or no interest in the question, inasmuch as by cove-

nants with Rogers and others, the vendees, he is protected individually from all charges on the same.

The purchasers of this stock cannot be affected by any admissions of Vermilya made after such purchase. Had there been proof of a formal recognition prior to the trans-. fer, the case might have been different. They had con- structive notice of the existence of the claim from the articles of association and lists, of which they must be presumed to have been informed. But this left every ground of defence open. For the reasons before stated I am of opinion, that, as against such purchasers Mitchell's agency is made out, so as to bind them to contribute to the payment of the $10,000 and not to transfer a portion of the land. This is subject to the right to require an action to try the question whether an agreement to pay the $10,000 was ever entered into.

The decree will be settled upon these principles.