## Case No. 9,043.
### MANNING v. HAYDEN.

[5 Sawy. 360; 7 Reporter, 423, 424; 13 West. Jur. 317, 318; 8 Am. Law Rec. 38; 1 San Fran. Law J. 85.] [1]

Circuit Court, D. Oregon. Jan. 20, 1879.[2]

TRUSTS — AGENT — REAL PROPERTY—STATUTE OF FRAUDS—STATUTE OF LIMITATION—ATTORNEY AND CLIENT.

1. Where a person acquires the legal estate in real property as the agent of another, or upon a trust and confidence that he will acquire it for the benefit of such other, equity will imply a trust in favor of the latter, and compel the purchaser to account to him accordingly.
[Cited in Gest v. Packwood, 39 Fed. 537.]

2. Such a transaction is not within the statute of frauds, and, therefore, the trust need not be manifested by a writing, the law implying it from the circumstances of the case.
[Cited in brief in Vallette v. Tedens, 14 N. E. 53, 122 Ill. 609.]

3. Cases of constructive trust being purely of equitable cognizance, lapse of time is no absolute bar to a suit for relief thereon; but each case depends upon its own nature and circumstances—the court taking the statute as a guide or suggestion, rather than a command.
[Cited in Stevens v. Sharp, Case No. 13,410; Traver v. Tribou, 15 Fed. 28; Hickox v. Elliott. 22 Fed. 18; Lakin v. Sierra Buttes Gold Min. Co., 25 Fed. 344; Allen v. O'Donald, 28 Fed. 24; Powell v. Oregonian Ry. Co., 38 Fed. 191; Gest v. Packwood, 39 Fed. 535; U. S. v. Wallamet V. & C. M. Wagon Road Co., 42 Fed. 358; Id., 44 Fed. 241.]

4. Where an attorney is employed by the defendant in a suit to enforce the lien of a mortgage, the relation of attorney and client continues until the final determination of the matter by the confirmation of the sale, unless the attorney's employment was expressly otherwise limited, or he was discharged in the meantime with the consent of his client, or by the order of the court.

5. An attorney who purchases for himself his client's property at a judicial sale, thereby acquires an interest contrary to his duty as attorney, and, therefore, the purchase will be held void, or the attorney a trustee for the client, at the option of the latter, unless it satisfactorily appears that he was in no wise injured or prejudiced thereby.

This suit is brought by the plaintiff [Charles Manning], a citizen of California, against the defendant [Benjamin Hayden], a citizen of Oregon, to compel a conveyance of certain premises situated in Polk county, containing three hundred and nineteen acres, and known as the south half of the Bethuel and Rachel Dove donation, the same being parts of sections 2 and 3, in township 8 south, of range 4 west, of the Willamette meridian. Substantially the bill alleges that the premises

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 7 Reporter, 423, 424, and 3 West. Jur. 317, 318, contain only partial reports.]

[2] [Reversed in 106 U. S. 586, 1 Sup. Ct. 617.]

in controversy were the property of said Rachel, the wife of said Bethuel, the same being her half of the donation aforesaid, which was made by the United States to said Bethuel and Rachel, in consideration of the occupation of the same by the former, as a settler under section 4 of the donation act of September 27, 1850 (9 Stat. 497), from and after December 1, 1848; that on March 2, 1859, said Bethuel borrowed one thousand five hundred and fifty dollars from the county aforesaid to pay the balance of a debt then due one William Griswold, and upon the same date said Rachel and her husband executed a mortgage of the premises to secure the payment of said loan; that at the date of the said mortgage the defendant was a practicing attorney, and was the attorney and confidential advisor of said Bethuel and Rachel in the matter of said loan and mortgage and otherwise; that the defendant, for the purpose of enabling himself to cheat and defraud said Rachel out of her donation, solicited her to execute said mortgage, and assured her that he would mortgage his own home-farm before she should thereby lose her property; and that by means of such solicitations and assurances she was induced to execute said mortgage; that on October 23, 1863, suit was brought to enforce the lien of said mortgage, in which the defendant, as the attorney of the mortgagors, appeared and made a defense thereto, notwithstanding which, on November 18, 1863, a decree was given in said suit to the effect that said premises should be sold as upon execution to satisfy the sum then due upon said loan—two thousand and fifty dollars and seventy-three cents in currency—together with the costs of suit, and that thereupon said premises were advertised for sale; that prior to the date of such sale the defendant informed said Rachel that he would see that the property was bid off for her benefit, and would protect her rights therein, and that in consequence of such information, and relying upon the honesty and integrity of said defendant, she did not attend such sale, and took no steps to secure her interest in said property; that said premises at the sale thereof were worth four thousand dollars in gold coin, while the defendant bid in the same in his own name for the sum of one thousand two hundred and twenty-five dollars in currency, then not worth more than six hundred and twelve dollars and fifty cents in gold coin, and afterwards stated and caused said Rachel to believe that said premises "had been bid off in her name, and for her benefit, and that the amount necessary for her to pay to redeem the same was the said sum of six hundred and twelve dollars and fifty cents;" that relying upon such statements and the honesty of the defendant as aforesaid, said Rachel, in July, 1864, paid defendant two hundred dollars in gold coin upon said bid, which he received with the understanding it should be so applied; that said

Rachel and her husband continued in the possession of said premises as owners, and intending to redeem the same as aforesaid, until about August, 1865, when the defendant, intending and contriving to disseise the said Rachel, fraudulently procured her tenant, one O. H. Smith, to surrender the possession thereof to him, and has ever since retained the same, and received the rents and profits thereof to the value of four hundred dollars a year; that but for the promises and representations of the defendant as aforesaid, said Rachel could and would have made other arrangements, and secured the redemption of the property for her benefit; that the defendant afterwards obtained a deed to said premises, as the purchaser thereof, from the sheriff making the sale, and claims to be the owner of the same in his own right, and refuses to convey the same to the said Rachel, or account to her for the rents and profits thereof; that on April 7, 1865, said Rachel being aged and infirm, and unable to prosecute her claim to the premises, for a valuable consideration, conveyed the same and all her claim for rents and profits to the complainant; and that at the date of such conveyance, the rents and profits then received by the defendant had more than paid the balance due him, and the premises were in equity the property of said Rachel, and she was entitled to a conveyance of the same from the defendant.

The defendant demurred to the bill for divers causes, but upon the argument only insisted upon two: (1) That the alleged trust not being in writing, is void; and, (2) that at the date of the conveyance aforesaid to the complainant, his grantors had no interest in the premises, and nothing to assign, except a mere right of suit, which is not assignable.

The court overruled the demurrer, saying: "Upon the facts stated in the bill I think that the plaintiff is entitled to the relief sought. After a careful consideration of the argument and authorities submitted for the defendant, my impression is, that this is not a case of mere agreement within the statute of frauds, but one of a fraud practiced by an agent or attorney upon his principal or client, whereby the former was enabled to acquire the legal title to the premises, to the prejudice and wrong of the latter. In such cases equity will redress the wrong by raising or implying a trust in favor of the injured party. The wrong-doer is held to be a trustee ex maleficio. 2 White & T. Lead. Cas. Eq. 708: Baker v. Whiting [Case No. 787]; Ryan v. Dox, 34 N. Y. 307. If my impression is correct upon this point, then the demurrer is not well taken upon the second one. If, notwithstanding the deed from the sheriff to the defendant, he is only the trustee of the estate, Rachel Dove was the owner of the premises in equity, and could convey the trust estate —the beneficial interest—to the complainant. Baker v. Whiting, supra. And such a conveyance passes an interest in the property, and not a mere right of suit.

The defendant had leave to answer, the court saying: "It is to be understood that this opinion is expressed subject to correction on the final hearing, when the questions argued upon this demurrer may be considered in the light of the pleadings and proofs in the case."

The answer of the defendant admits that he was attorney for Bethuel Dove prior to the execution of the mortgage, but denies that he acted as such attorney in the matter of this loan and mortgage, or that he advised the same, or had any knowledge or information concerning the same until long after they were made. It denies that the defendant was employed by Bethuel and Rachel Dove to defend the suit, to enforce the lien of the mortgage, but admits that he was so employed by Bethuel, and that to gain time for him he interposed a demurrer to the bill which was overruled. It denies that the defendant informed or promised Rachel Dove that he would bid in the premises for her at the sheriff's sale, or that there was any understanding to that effect, but alleges that the Doves admitted their inability to hold the land, and asked him to buy for himself. It denies that the premises were worth four thousand dollars in gold coin, and alleges that they were not worth more than one thousand two hundred and twenty-five dollars, without stating in what kind of money. It alleges that the sale of the premises was made on March 5, 1864, after being twice delayed for want of bidders, and that the sheriff's deed to the defendant was executed on April 26, 1864. It denies any information as to the value of currency at the date of the sale, but alleges that Bethuel and Rachel Dove thereby obtained a credit on their debt to the county of one thousand one hundred and seventy-seven dollars and fifty cents, that being the amount for which the property was sold, less the costs. It denies that the defendant ever gave Rachel Dove to understand that she could redeem the land by the payment of six hundred and twelve dollars and fifty cents in gold coin, or that she paid him two hundred dollars in pursuance thereof, but admits that in the summer of 1864, at the request of Bethuel Dove, he agreed with him that if he would repay the defendant the purchase-money, with interest, within a year from the date of the sheriff's sale, he would sell said Dove the premises upon those terms, and thereupon said Dove paid him two hundred dollars in gold coin upon said bargain, it being then and there further agreed between the parties, that in case the balance of said purchase-money was not paid within the time specified, that the said two hundred dollars was to be applied as rent money for the use of said land; that within the first year said Dove occupied the premises, under said agreement, he cut and sold therefrom four hundred dollars worth of timber, and because defendant remonstrated with him for so doing, he left the place and rented the same to O. H. Smith, aforesaid, but retained the possession of thirty acres thereof, which he "cropped the second year," against the remonstrance of the defendant. It denies that the defendant procured Smith to surrender the possession of the premises to him, but alleges that he received such possession from Moses Clark, the sub-tenant of Smith, on October 31, 1865; and also that said Rachel ever demanded the possession of the premises from the defendant, or an account of the rents and profits thereof. It denies that said Rachel ever conveyed her interest in the premises to the complainant for "a valuable, or any consideration," or that the complainant is, in good faith, the lawful owner thereof, or that since said sheriff's sale, she was ever the owner in equity or otherwise, of said land, or any part thereof. It alleges that in 1864, the premises were worth two hundred dollars a year, but that since 1865, the defendant has expended four hundred and eighty dollars in clearing and breaking one hundred and fifty acres thereof, five hundred and forty dollars for posts and plank fence, and four hundred dollars for other fencing thereon, and three hundred dollars for building a barn and repairing a dwelling thereon, since when the value of the premises has been three hundred dollars a year, and that he has paid taxes upon the property to the amount of two hundred dollars; that the contract aforesaid for the sale of the premises to Bethuel Dove was not in writing, and, therefore, void, and that more than six years have elapsed since the expiration of said agreement.

A general replication was filed in the answer. The evidence of a number of witnesses, including that of the defendant and Bethuel and Rachel Dove, was taken before the examiner, and read on the hearing.

George W. Lawson, H. Y. Thompson, and Claude Thayer, for complainant.

E. C. Bronnaugh and William H. Effinger, for defendant.

DEADY, District Judge. Upon the evidence, including the answer of the defendant, the following facts are satisfactorily established: That on September 18, 1874, the register and receiver of the proper land-office issued a certificate, under section 7 of the act of September 27, 1850, aforesaid, from which it appears that the premises in controversy are the wife's half of the donation of Bethuel and Rachel Dove, granted to them by section 4 of the act aforesaid, on account of the husband's settlement and occupation thereon, commencing on December 1, 1868; that some time prior to 1858, and up to 1865, the defendant was the general attorney and trusted adviser of Bethuel Dove and his wife; that in 1858, one William Griswold, after serious litigation, obtained a judgment against Bethuel Dove for over eight thousand dollars, in which litigation the defendant acted as the attorney of said Dove, and as such, procured one J. B. V. Butler, also a friend and client

of his, to sign an undertaking for an appeal from the judgment of said district court to the supreme court of the territory, by which undertaking the parties thereto became bound to pay said judgment, if affirmed, whereas said Butler, at the time of signing said undertaking, understood from the defendant that it was for the costs of the appeal only; that said judgment was affirmed, and all the property of said Dove liable to execution, consisting of the north half of said donation and other lands, were sold to satisfy the same, and that in March, 1859, there was still due upon said judgment the sum of about four thousand dollars, for which said Butler was liable as a defendant therein, but which was afterwards paid by said Bethuel; that on March 2, 1859, said Bethuel and Rachel executed a mortgage upon the premises in controversy to the treasurer of Polk county, to secure the payment of the sum of one thousand five hundred and fifty dollars, then borrowed by said Bethuel from the school fund of said county, and payable three years thereafter, with interest at one per centum per month, to apply upon said judgment, and so far relieve said Butler from his liability thereon; and that the defendant advised said loan and mortgage, and was instrumental in procuring the former, and inducing said Rachel to execute said mortgage, and received some one thousand dollars thereof from said Bethuel and Rachel to apply upon said judgment; that after said debt became due, suit was commenced by the treasurer of said county, in the circuit court thereof, to recover the same, and enforce the lien of said mortgage, to which suit said Bethuel and Rachel were parties defendant, and the defendant appeared therein as their attorney, and made a defense thereto by demurrer, and on November 18, 1863, a decree was made therein, that the plaintiff recover two thousand and fifty-two dollars and seventy-five cents and costs, and that the premises in controversy be sold as upon an execution at law to satisfy the same; that upon March 5, 1864, the said premises were sold, and bid in by the defendant, for the sum of one thousand one hundred and twenty-five dollars, in currency, the sale having been twice postponed in the meantime, "for want of bidders, and other sufficient causes," which sale was confirmed by said court on April 26, 1864, and a deed of the premises executed by the sheriff to the defendant on the same day; that at the date of such sale, the defendant was the attorney of said Bethuel and Rachel in said matter, and, moreover, in making such purchase and receiving said conveyance, was acting on behalf of said Doves, in pursuance of an understanding between himself and them, whereby the defendant was to bid in said premises at the sale, in case they went low enough, as was expected, for the benefit of said Rachel, who was to redeem the same as soon as she could, in a reasonable time, and thereby secure a home for herself and husband in their poverty and old age, and that said Bethuel

and Rachel relied upon said understanding, and, therefore, took no other steps or means to secure the property, or redeem it within the time allowed by statute, as they might, and would have otherwise, done; and that on July 26, 1864, said Bethuel, in pursuance of said understanding, paid the defendant, for said Rachel, two hundred dollars in gold coin, for which he gave the following acknowledgment in writing: "Received of B. Dove, two hundred dollars, to be applied on purchase of land purchased by me at sheriff's sale. The land known as Mrs. Dove's half of donation land claim, July 26, 1864. (Signed) B. Hayden;" but that the defendant afterwards, by prohibiting said Bethuel from cutting and selling saw-logs from the premises, and by procuring the tenant of the Doves—O. H. Smith, to whom the farm was rented in the fall of 1864, when Mr. Dove took up a homestead upon an island near by, where he has since lived—to pay him the rent due them; and finally, in the fall of 1865, to surrender the premises to him, hindered and prevented said Bethuel and Rachel from obtaining and acquiring the money wherewith to complete said redemption as per the agreement and understanding aforesaid; that said Bethuel and Rachel are illiterate persons, not being able to read or write, and ever since the loss of the premises have been poor and without means to prosecute a suit for the same, while the defendant, by his position and influence in the county, has made it difficult, if not impossible, for them to assert their rights in the local tribunals with effect; that in September, 1874, said Rachel commenced a suit against the defendant, in the circuit court of Polk county, to recover the premises, but the same was afterwards dismissed by her, and the premises, on April 7, 1875, as aforesaid, conveyed to the plaintiff, her son-in-law, for a valuable consideration, with the expectation and understanding that the plaintiff would bring a suit in this court to recover the premises; and such plaintiff thereby became, and now is, the owner of whatever right and interest therein the Doves then had; that at the date of the purchase of the premises by the defendant—March 5, 1864—the currency, or United States legal tenders, paid by him, was only worth, in gold coin, sixty-five cents on the dollar—seven hundred and ninety-six dollars and twenty-five cents—and that the premises were then worth not less than two thousand dollars in gold coin, and probably three thousand dollars, and are now worth, exclusive of improvements, not less than ten thousand dollars; that the defendant was allowed to purchase the property for a sum so far below its real value, because he was well known in the community as the attorney and friend of the Doves, and was very naturally understood to be acting in their behalf; and that the sum due to the defendant, in coin, on account of this transaction, on January 1, 1879, is as follows: Paid on land March 5, 1864, seven hundred and ninety-six dollars and

twenty-five cents; interest thereon at ten per centum for fourteen years, nine months and twenty-five days, eleven hundred and seventy-nine dollars and ninety-seven cents; taxes paid on land, two hundred dollars; present value of permanent improvements placed thereon, one thousand dollars; total, three thousand one hundred and seventy-six dollars and twenty-two cents; and that he is chargeable thereon as follows: Rent of premises from January 1, 1866, to January 1, 1879, thirteen years, at two hundred and fifty dollars a year, three thousand two hundred and fifty dollars; interest thereon at rate aforesaid, one thousand nine hundred and fifty dollars; cash received, July 26, 1864, two hundred dollars; interest on the same at the rate aforesaid, for fourteen years and five months, two hundred and eighty dollars and thirty-three cents; total, five thousand six hundred and eighty dollars and thirty-three cents; balance against defendant, two thousand five hundred and four dollars and eleven cents; from all of which it appears that the defendant has been long since repaid the money advanced to the Doves, and also his subsequent expenses in connection with his occupation of the premises.

The evidence is conflicting concerning some of these conclusions of fact but the truth is generally apparent, notwithstanding. I do not propose to discuss it in detail, but there are one or two points that justify some special attention. As to the circumstances concerning the preparation and execution of the mortgage there is a direct conflict between the testimony of the Doves and that of the defendant and his witness, Reason R. Boothby. The contradiction can hardly be explained upon the theory of a failure of memory or an unintentional mistake, and therefore it almost necessarily involves willful falsehood.

At the date of the transaction the defendant was living on his donation claim a few miles north of the Doves while Boothby lived at Eola, about half way between them. The Doves swear unqualifiedly that Hayden came to their house and prepared the mortgage there, using Ford's notes of the claim survey which they had, in describing the premises, and left it with them, saying he would send Boothby—a justice of the peace—down to take their acknowledgment; that Boothby came down the next day or two, when they executed and acknowledged the instrument.

On the contrary Hayden swears both in his answer and testimony that he never wrote a line of the mortgage and don't know who did—that he never advised it or knew anything about it until some time after the execution. Boothby testifies that he wrote the mortgage including the names of the mortgagors thereto — Bethuel and Rachel Dove—in short, that he wrote every word of the instrument, except the names of the attesting witnesses—George Bolter and Theodore Ingalls.

The Doves, although not parties in interest, are not disinterested witnesses by any means, while the defendant is deeply interested in the result in both property and character. Boothby does not appear to be a person of any particular character or standing. During the past twenty years he appears to have lived from place to place in Oregon and Washington, for the most part east of the Cascades, and is a painter by trade.

A very satisfactory solution of this problem is furnished by an inspection and comparison of the writings on the mortgage with one another and with that on the receipt of July 26, 1864; and also the signatures of the defendant and said Boothby to their evidence given before the examiner in this cause. The mortgage bears upon its face indubitable evidence that Boothby's story is untrue—that he never wrote a word of the mortgage except the certificate of acknowledgment and his signature thereto, as an attesting witness. In the first place, Boothby's story and that of the defendant do not agree, for while the latter says he knew nothing about the making of the mortgage, the former said he went to Dove's to attend to his business at the request of the defendant who then furnished him with a blank form upon which to write the mortgage and a prepared description of the premises.

The mortgage is upon a printed form of a deed of bargain and sale. The body of it contains twenty-two lines, which are written or mostly in writing, and the certificate six such lines, beside the signature of Boothby. The handwriting of the body of the instrument and the certificate are both unskillful, but quite uniform and marked in character and radically different. It is safe to say, they were never written by the same person. The difference in the capital Rs, Bs, Ds, Ps and figure 9s is very noticeable. But this is not all. In the body of the instrument the name Rachel is incorrectly spelled with an "ae" in the last syllable, while in the certificate it is spelled in such syllable with an "a" only. Bethuel is spelled correctly in the body of the instrument, but in the certificate it is spelled without an "e" in the first syllable. It is also apparent that this name was first written in the certificate as "B-huel" and then before completion corrected into "B-thuel," by making the loop of an "h" upon the m stroke or lower part of the first "h," and thus converting the latter into a "t." But the loop of the second "h" did not come down directly upon the m stroke of the first one, but at an angle, on the outside, thus leaving the process of emendation quite apparent.

The signatures of Bethuel and Rachel Dove to the mortgage were evidently written by the subscribing witness, George Bolter, who wrote a plain, bold, round hand, as unlike that in the body of the instrument or the certificate as light and darkness.

Again, the words in the condition of the

mortgage—"according to the tenor and effect of a certain promissory note," and the words "and fifty" in the premises of the deed immediately following the words "fifteen hundred," and the word "their" in the concluding clause are in a very different writing from the rest of the instrument. They are written in a skilled hand with different ink, and upon comparison with the indorsement in red ink on the back of the instrument, showing when and where it was recorded, appear to be the writing of Mr. Lucien Heath, the then recorder of Polk county and secretary of state elect.

The second and third of these insertions merely supply manifest omissions, while the first only formally expresses what would otherwise be implied from what was already expressed. Before this interlineation, the condition read: "This conveyance is intended as a mortgage to secure the payment of the sum of *fifteen hundred and fifty dollars*," all but the words in italics being printed, and continued thus: "The note executed by Bethuel Dove," etc., putting "the note" in apposition with "the sum of fifteen hundred and fifty dollars," which is represented. The interlineation "according to the tenor," etc, was placed between the words "dollars" and "note" aforesaid. and the pen drawn through the "The" before the word "note."

As it does not appear that Mr. Heath was present when the mortgage was executed. it is probable that these interlineations were made by him at the county seat, Dallas, when the instrument was taken there by Dove, or other person, to obtain the money from the county treasurer, and was delivered to him for record.

Attention is called to these interlineations and insertions after the execution of the instrument, not to suggest that any wrong was committed or intended thereby, but to show the incorrectness of Boothby's testimony. who deliberately and repeatedly swore that he wrote every written word in the instrument except the signatures of Bolter and Ingalls, the subscribing witnesses.

Neither is this all. Boothby swears in effect that he took a clean blank with him to Dove's on March, 1859, upon which he then and there wrote this mortgage, and it is very certain that this is not so. The mortgage reads: "This indenture, made this second day of March. A. D. 1859," the words "second" and "March," and the figure "9" being in writing. But upon examination it plainly appears that in place of these words there was first written "twenty-sixth" and "February," the latter words being partially erased, and the former written over and in place of them. Neither were the words "second" and "March" written by Boothby, but probably by Bolter, who appears to have been the best penman that made a mark upon the paper, unless it was Heath, while the words "twenty-sixth" and "February" appear to have been written by the person who wrote the body of the instrument. The coincidences are most convincing, but one is almost demonstrative. The letter "x" in "twenty-sixth" is formed by two perpendicular curved lines with their convex sides approaching and connected by a hyphen or horizontal line, thus )·(. According to my observation it is a very singular formation of the letter, and an almost certain mark of identification. The only other written "x" in the instrument is found in the body of it, in the word "executed," and that is made in precisely the same way.

But the fact of the alteration of the date is a very significant one. It not only tends to prove that Boothby did not write the instrument as alleged, but also that it was drafted. as the Doves testify, by some one other than Boothby before the day of its execution, only the time was four days instead of one or two as they remember it.

The instrument having been drafted on February 26. when the parties came to execute and acknowledge it before Boothby, on March 2, it would naturally occur to some one that the date ought to be corrected, and so the words "twenty-sixth" and "February" were changed to "second" and "March." but not so as to prevent the paper from revealing to the microscope, and even the naked eye, the truth of the transaction.

From these facts, and the striking similarity between the writing in the body of the mortgage and that in the receipt of July 26. which is admitted to be the defendant's, as well as his signature to the examination, it is morally certain that the defendant wrote the mortgage as the Doves testify. The receipt is more than five years later in time than the mortgage; but making some allowance for the careless way in which the former is written, as compared with the latter—it being necessary to write somewhat closely and small to get the matter in the spaces left in the blank—and for some freedom of hand acquired in the meantime, as well as the difference in pen, ink and paper, the writings are very like. All the peculiarities of style—and they are many and marked—observable in the one are apparent in the other. The capital Rs, Bs, Ps and Ds are very notable·instances. The terminal ds are uniformly made with an upward and outward curl from the o, instead of a stem, while the middle ones are just as constantly made with a stem. which is well detached from the body of the o—the latter being open. The figure 8 in the two writings is very singular, and "they are like as two black-eyed peas." The s, the ps, the words "Dove," "hundred," "land," "claim" — in short, the whole face and expression of the one is exhibited in the other.

In this connection it may be also mentioned that at the taking of the evidence before the examiner, this receipt was mislaid and supposed to be lost, and counsel for the plaintiff put in a paper which he testified was a

true copy. The defendant being examined afterwards in his own behalf, and while it was thought the original was lost, swore unqualifiedly that it did not contain the final words, "the land known as Mrs. Dove's half of donation land claim;" and that it was for two hundred dollars, "to be applied on land purchased by me at sheriff sale," omitting the words in italic, "to be applied on *purchase of land purchased by me.*" etc. Subsequently the receipt was found and produced and read on the hearing.

Next, as to the agreement or understanding between the defendant and the Doves concerning the purchase and redemption of the premises. All the circumstances, and particularly the payment of the two hundred dollars, and the receipt therefor, tend strongly to show that the defendant bid in the property at the sheriff's sale, as the attorney and friend, and for the benefit of the Doves. and that they were to remain in possession and have the benefit of the use and occupation of the place to enable them to repay him the purchase-money with interest; and also that the defendant after a time conceived the design—lucri causa—to ignore his relation and understanding with the Doves, and claim the property as his own. The apparent excuse for this breach of faith was, that these poor, old, unfortunate people would never be able to repay him, and to make sure of this, he did what he could to prevent them from so doing, by depriving them in the meantime of the use and possession of the property.

The defendant pretends that the agreement to redeem was made at the date of the receipt, and not before; and that he did not believe, at the time, that the Doves would be able to perform it, and therefore he made the further conditions that if the redemption was not completed within a year from the date, that is, by March 5 next following, the agreement should be at an end, and the two hundred dollars then paid on it be retained by him as rent of the premises for such year. But with this statement the known and undisputed facts of the case are at variance. The receipt itself is directly opposed to it. If such was the agreement, why does it not appear in this writing? and especially, why does it not contain some reference to the alleged conditions, that the redemption was to be made within eight months from that date, and if not, that the two hundred dollars then paid should be retained by the defendant as rent? The defendant is an attorney, and a person of shrewdness and experience. These provisions are altogether in his favor, and it was his interest to preserve the evidence of them. While he was writing the memorandum, a few words. more or less, would have expressed them. The Doves, according to his statement. had no rights in the premises as against him, and so far as terms are concerned, were at his mercy. But the language actually used in the writing is also contradictory of the defendant's statement. The re-

ceipt is not simply for two hundred dollars received by the defendant on account of land then sold the Doves, or then purchased back by them from him. On the contrary, it is in terms and effect for two hundred dollars, to be applied on purchase of Mrs. Dove's land theretofore purchased by the defendant at sheriff's sale. To be applied on what purchase? Why, manifestly, the purchase made at the sheriff's sale, thus suggesting distinctly what the Doves assert, that the land, though purchased at such sale by the defendant in his own name, was, in fact, purchased for them, and was in equity and good conscience, their purchase. Upon no other theory of the facts can effect be given to this word "purchase" in the receipt, or its use therein satisfactorily accounted for. Indeed, some such view of the matter must have suggested itself to the mind of the defendant, for he could not remember, when it was thought the receipt was lost, that it stated that the money was to be applied on the purchase of Mrs. Dove's land-claim, and swore to the best of his recollection that these words were not in the receipt; and by way of giving emphasis and weight to his testimony in this respect, swore that he had seen the receipt, and scrutinized it closely, since this matter was placed in the hands of counsel.

As to the value of currency at the date of the sheriff's sale, I have consulted the contemporaneous quotations of the price of gold and find that legal tenders were then worth, in Portland, sixty-five cents on the dollar, which makes the amount advanced by the defendant, in gold, seven hundred and ninety-six dollars and twenty-five cents. The only testimony upon this point was that of the defendant and Dove, the former stating that they were worth about seventy-five cents and the latter fifty cents; but he also states, what he was more likely to remember, that the amount to be repaid the defendant was about seven hundred dollars in coin.

As to the value of the property in 1864, the testimony is very conflicting. the opinions varying from seven hundred dollars to four thousand dollars in coin. Much of it is unsatisfactory, and some of it utterly incredible; as for instance, that it was not worth more than two dollars per acre. In a country where land is the foundation of society, and agriculture the chief occupation of the people, a certain amount of knowledge upon this subject is common to most persons, and in considering this question it cannot be overlooked that this property is the half of a donation claim selected in 1848, and therefore probably choice land and favorably situated; that it lies very near the Willamette river, within a few miles of the capital of the state; that with any kind of cultivation, much of it will produce at least twenty bushels of wheat and forty bushels of oats to an acre, one year with another, and that probably it has not, since 1851, been held at a less value than ten dollars per acre, and under favorable cir-

cumstances, might have been sold for that at most any time since. In arriving at this conclusion, weight has been given to the fact that in 1859 the property was accepted by the county treasurer of Polk county, as sufficient security for one thousand five hundred and fifty dollars, in coin, payable within three years, with twelve per centum interest. From this fact it must have been valued at about three thousand dollars; and I have no doubt but that was what it was then generally considered worth. And this shows that the inadequacy of the consideration advanced by the defendant, was very marked, it being at most a little over one third its real value, an inadequacy "so gross and manifest as to shock the conscience."

It has been suggested that the price paid, one thousand two hundred and twenty-five dollars, in currency, was credited on the decree against the Doves at par, and therefore the defendant ought to be considered as having advanced that much for them in coin or its equivalent.

So far as Rachel Dove is concerned, a sufficient answer to this suggestion is found in the fact that the decree against her, so far as it was in personam and for money, was void. She was not indebted to the county. She did not join with her husband in the note for the loan; and if she had, being a married woman, the act would have been a nullity. Norton v. Meader [Case No. 10,351]; Dick v. Hamilton [Id. 3,890]. By the mortgage she pledged her property for her husband's debt, and by its sale on the decree it was discharged from the lien.

The parties seem to have acted upon the theory that the husband had no interest in the wife's land. But this was a mistake. Bethuel Dove was seised of an estate for his life in the donation of his wife by virtue of the marriage. Starr v. Hamilton [Id. 13,314]; Wythe v. Smith [Id. 18,122]. But even as to the husband, if the defendant acted for him in making the purchase, the advantage, if any, accrued to the former and not the latter. Between them, the question is, not what effect did the payment of the currency have upon the decree, but what did it cost the defendant? What did he advance? McDowell v. Milroy, 69 Ill. 500.

Upon this state of facts, and leaving out of view, for the present, that the defendant was also the attorney of the Doves at the date of this transaction, the law implies a trust between the defendant and them. His conduct being inequitable and unjust, and involving a gross breach of the special trust and confidence reposed in him by the Doves to their serious injury and his corresponding advantage, equity will treat him as a trustee of the property thus wrongfully acquired, and hold him liable accordingly. 1 Perry, Trusts, §§ 166, 168; 2 Story, Eq. Jur. §§ 1254, 1261, 1265; 3 White & T. Lead. Cas. Eq. 139; Gaines v. Chew, 2 How. [43 U. S.] 649. This is a case of constructive trust, a trust arising out of the misconduct of the defendant, and does not depend upon the existence of a writing. It is without the statute of frauds, and the facts constituting it may be shown by parol. 1 Perry, Trusts, § 85; 2 Story, Eq. Jur. § 1531; 1 Greenl. Ev. § 266; Jenkins v. Eldridge [Case No. 7,266]. This being so, there is no doubt but that the Doves had an interest in the premises at the date of their conveyance to the plaintiff. In addition to the authority cited on the hearing of the demurrer upon this point, reference is made to Perry on Trusts (section 227) where it is said: "The right of a party who has been defrauded of the title to his land, is not a mere right of action to set the deed aside, but it is an equitable estate in the land itself, which may be sold, assigned, conveyed and devised. In the view of a court of equity, he is still the owner of the estate, subject to repay whatever money or other property he may have received from the fraudulent grantee."

But it is contended for the defendant, that this suit is barred by the lapse of time. That the plaintiff or those under whom he claims have been guilty of laches—have slept upon their rights.

In the consideration of purely equitable rights and titles, courts of equity act in analogy to the statute of limitations, but are not bound by it. As was said in this court in Hall v. Russell [Case No. 5,943]: "When an action upon a legal title to land would be barred by the statute, courts of equity will apply a like limitation to suits founded upon equitable rights to the same property. So, in cases of implied or constructive trusts, when it is sought for the purpose of maintaining the remedy, to force upon the defendant the character of a trustee, courts will apply the same limitation as provided for actions at law." Citing Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 176; Miller v. McIntyre, 6 Pet. [31 U. S.] 66; Beaubien v. Beaubien, 23 How. [64 U. S.] 207; to which may be added Wisner v. Ogden [Case No. 17,914]; Kane v. Bloodgood, 7 Johns. Ch. 110; and Michoud v. Girod, 4 How. [45 U. S.] 560. Apply this rule to this case, and this suit may be maintained at any time within twenty years from the fall of 1865, the time when the defendant finally repudiated the arrangement with the Doves and wrongfully took possession of the premises, that being the period limited by statute for the commencement of an action at law therefor.

But where the trust is constructive and also arises out of the fraud of the defendant, there does not appear to be any fixed rule upon the subject. The matter is left to the equitable discretion of the court to be decided in each case according to its nature and circumstances, subject to the qualification that diligence must be used to establish a trust by implication, and that equity will not aid a party to enforce such a trust when the demand is stale or where there has

been long acquiescence in the wrong. 1 Perry, Trusts, § 228.

Periods ranging from fifty to seventeen years have been held to be a bar, and under other circumstances a delay of from eleven to eighteen years has been held to be no bar. Perry, Trusts, § 229. In Michoud v. Girod, 4 How. [45 U. S.] 561, where the matter was thoroughly examined, Mr. Justice Wayne says: "Within what time a constructive trust will be barred, must depend upon the circumstances of the case. Boone v. Chiles, 10 Pet. [35 U. S.] 178. There is no rule in equity which excludes the consideration of circumstances, and, in a case of actual fraud, we believe no case can be found in the books in which a court of equity has refused to give relief within the life-time of either of the parties upon whom the fraud is proven, or within thirty years after it has been discovered or becomes known to the party whose rights are affected by it."

This suit was commenced within eleven years, and the one in Polk county within nine years from the time the defendant took possession of the premises and disavowed the understanding and obligation under which he acquired the legal title, so that in any view of the matter there is no ground on which to rest a claim that this suit is barred by lapse of time, or that the demand is stale, or the wrong long acquiesced in. Indeed, considering the circumstances of the case, and the unequal condition of the parties, the court would not be justified in refusing relief upon the case made, if twenty years had elapsed from the commission of the wrong.

But the decision of this case can be put upon higher and safer ground than the contracts and understandings of the parties, which are liable to both misrepresentation and misapprehension.

If the defendant was the attorney of the Doves at the time he bid in this property, he must be considered as acting for them, and he is liable to them therefor as their trustee, unless he can show satisfactorily that he has purchased for himself with his clients' consent, and that the transaction was in every respect fair, and not to their disadvantage. The presumption is against him, and the burden of proof is upon him; and if his interest as a purchaser may conflict with his duty as an attorney, the sale will be held void, or the attorney charged as a trustee, at the option of the client. This rule is alike necessary to preserve the dignity and integrity of the legal profession, and to protect the interests of a dependent and confiding clientage; and in the enforcement of it courts will not hesitate, because the injury to the client does not fully appear, or a positive intention on the part of the attorney to gain an advantage is not shown. This statement of the law will be found fully supported by the following authorities,

some of which go even beyond it, and hold that a purchase by an attorney of the subject of litigation cannot be maintained against the client under any circumstances. 1 Perry, Trusts, § 166; Case v. Carroll, 35 N. Y. 388; Harper v. Perry, 28 Iowa, 60; 1 Story, Eq. Jur. §§ 312, 313; Berrien v. McLane, 1 Hoff. Ch. 428; Cutts v. Salmon, 5 Eng. Law & Eq. 95, 12 Eng. Law & Eq. 317; Ward v. Carttar, L. R. 1 Eq. 29; De Rose v. Fay, 3 Edw. Ch. 389, 4 Edw. Ch. 44; Trotter v. Smith, 59 Ill. 244; Howell v. Baker, 4 Johns. Ch. 120; Hess v. Voss, 52 Ill. 481; Wade v. Pettibone, 11 Ohio, 60; Nesbit v. Lockman, 34 N. Y. 169; McDowell v. Milroy, 69 Ill. 500; Hawley v. Cramer, 4 Cow. 730; 1 White & T. Lead. Cas. Eq. 203; Evans v. Ellis, 5 Denio, 643; Weeks, Attys. at Law, §§ 273 et seq.

The already great length of this opinion precludes any citation from these authorities, but the following paragraph from Case v. Carroll, supra, is so exactly in point and so sound in doctrine and clear in expression that it may be cited notwithstanding:

"It is a settled principle of equity, that no person, who is placed in the situation of trust or confidence in reference to the subject of the sale, can be a purchaser of the property on his own account. And this principle is not confined to a particular class of persons, such as guardians, trustees or solicitors, but it is a rule of universal application to all persons coming within its principle, which is, that no party can be permitted to purchase an interest when he has a duty to perform inconsistent with the character of a purchaser."

But it is contended that the defendant was not the attorney of the Doves at the time of the purchase. It is admitted, however, that he was the general attorney of the husband, and it is not seriously contended that he was not such attorney for the wife also, through the agency of the husband, so far as she needed one. It is also admitted that he was the husband's attorney in the foreclosure suit; and finally upon the hearing the quibble that he was not the wife's attorney also in such suit, was frankly abandoned. And this accords with the record, which states unequivocally that he appeared for both, though the demurrer filed by him, or the transcript of it, states that "the above-named defendant"—in the singular—comes by B. Hayden, etc. But who is "the above-named defendant?" The reference is to the title of the cause in the beginning of the demurrer, and that reads, "J. Emmens, Treas. of Polk County v. Bethuel and Rachel Dove, Defts.," so that if there is any ground for saying that this demurrer was made by the defendant, for either of them rather than both, it is the wife who is expressly named in full, and who was the principal party in interest. But the omission of the s from the word defendant, in the body of the demurrer, is undoubt-

edly a mere clerical misprision and unworthy of serious contention or further consideration.

But it is claimed that the defendant ceased to be the attorney of the Doves from and after the date of the decree of sale in the foreclosure suit, or at most at the expiration of sixty days thereafter—the time then allowed for an appeal to the supreme court.

This sale, being made in a suit in equity, was a judicial one, and so in effect are all sales made upon execution in this state—that is, it was not made absolutely, but subject to the approval of the court which might upon the objection of the defendant set it aside, if it apeared that there were "substantial irregularities in the proceedings" concerning the same, to his probable loss or injury. Civ. Code Or. §§ 293, 413. If, then, the relation between the defendant and the Doves, of attorney and client, had not ceased before this sale, the defendant could not become a purchaser thereat on his own account, without raising a conflict between his duty and his interest. It was his duty to examine the circumstances of this sale and if he found good cause, to object to its confirmation. The property was sold for not more than one third its value. There is satisfactory testimony in the case that a neighbor intended to make the property bring at least the amount of the decree and costs, but learning that the defendant was going to bid for Mrs. Dove, and having sympathy for her, he generously forebore. But this was an irregularity which ought to have avoided the sale. The loss was a direct injury to Dove, who was left personally liable for so much of the decree as the sale of property ought to have satisfied, but did not. But the defendant, as he was situated, could not or would not bring this matter before the court, because, if he purchased for Dove, as was the understanding, his clients were satisfied, while if he purchased for himself, as he now claims, his interest would prevent it.

How or why the defendant ceased to be the attorney of the Doves before this sale is not shown, nor can it be. It is not claimed that there was any change of attorney or any agreement or understanding that his services were to stop short of the final determination of the matter, which was not the mere entry of the order of sale, but the final confirmation.

By the law of this state an attorney has authority to bind his client in any of the proceedings in a suit by an agreement. Civ. Code, § 1007. And he may be changed before the final determination thereof by consent, of record, or the order of the court. Id. § 1010.

As has been shown, the final determination of the proceeding in question was the order confirming the sale. It is not pretended that there was any change of attorney between the order and confirmation of sale, as provided by statute or anywise.

Still it is insisted that in some undefined and occult way the defendant dropped out of the case before the sale, and was thereafter a stranger to the proceeding. Suppose the defendant had not purchased and had signed a stipulation consenting to a re-sale, or had appeared in court and objected to the sale, would it have been necessary to enter his appearance anew as upon a first retainer, or would the court or opposing counsel have presumed or thought of asking for his authority to appear in the proceeding for his confirmation of the sale, in the suit in which he had appeared and acted as the defendant's attorney, in the preparation and hearing of the cause?

It seems to me that the matter is too plain for argument. The defendant was the attorney of the Doves when he made the purchase, and in so doing, if he purchased for himself, as he now claims, he put his duty to them in conflict with his interest as such purchaser, to the manifest injury of his clients, and therefore they have a right to treat the sale as void, or to hold him to account, as their trustee. If, on the other hand, he purchased it for them, as I find from the evidence he did, then of course he is their agent and trustee and bound to account to them as such.

The conclusions here stated, have not been lightly or hastily reached. But they are the result of a thorough examination of the case, and a full and careful consideration of the questions involved in it, after able and instructive arguments by the learned counsel, who appeared for the parties, particularly for the defendant. I now announce them with reasonable confidence in their conformity to the law and justice of the case, and with the comfortable assurance that if they are otherwise the defendant can appeal to so exalted a tribunal as the supreme court of the United States for their correction.

The decree of the court will be, that the defendant, within sixty days, convey the premises to the plaintiff by a good and sufficient deed, with proper covenants against his own acts, to be prepared and settled before the master of this court, and at the same time deliver possession of the premises, and that defendant within the same time pay the plaintiff his costs in this suit expended, and that in default thereof, execution issue therefor.

[NOTE. The defendant took the case, on appeal, to the supreme court where the decree of the court below was reversed and the case remanded, with a direction that the bill should be dismissed for want of jurisdiction and without prejudice to any other action in a proper court. 106 U. S. 586, 1 Sup. Ct. 617.]