## LAKIN *v.* SIERRA BUTTES GOLD MIN. CO.

*(Circuit Court, D. California.   October 26, 1885.)*

1. TRUST—OBTAINING LEGAL TITLE TO PROPERTY BELONGING TO ANOTHER.
   A party who wrongfully obtains the legal title to land which belongs rightfully to another, whether he acts in good faith or not, will be held a trustee for the equitable owner.

2. VENDOR AND VENDEE—BONA FIDE PURCHASER.
   One who purchases property in good faith for a valuable consideration, without notice of a prior equity, is a *bona fide* purchaser.

3. SAME—BURDEN OF PROOF.
   A party claiming to be a *bona fide* purchaser has the burden of proof to show affirmatively that he paid for the property, and had no notice of any prior equity.

4. SAME—PAYMENT OF VALUE—ACKNOWLEDGMENT IN DEED.
   The acknowledgment in a deed of payment of the consideration is not evidence, as against the owner of a prior equity, of payment of value.

5. PRINCIPAL AND AGENT—EFFECT OF NOTICE TO AGENT.
   It is well settled that the knowledge of an agent in respect to the subject-matter of the agency is the knowledge of the principal.

6. MINING CLAIM—ABANDONMENT—EVIDENCE.
   Abandonment is a voluntary act.   Evidence *held* not to show abandonment of claim.

7. SAME—FORFEITURE—RESUMING WORK.
   One who has forfeited his claim by a failure to work his claim as required by the statute may re-enter and resume work at any time before other rights attach in favor of subsequent locators.

8. STATUTE OF LIMITATIONS—LACHES—PLEADING.
   A formal plea of the statute of limitations, or of the special facts, is not necessary in equity to raise the defense of laches, neglect, or acquiescence.

9. SAME—TRUSTS.
   The statute of limitations does not begin to run against a *cestui que trust* in possession until ouster, whether the trust is an express or an implied trust.

In Equity.   The opinion states the facts.

*Vanclief & Gear,* for complainant.

*Garber, Thornton & Bishop,* for respondent.

SAWYER, J.   This case was submitted more than a year ago, but soon after its submission I was requested by counsel not to take the case up for decision, as negotiations for settlement were pending, and probably it would not be necessary to decide it at all.   Consequently I laid it aside.   I have been informed recently by counsel that there is no hope of settlement, and a decision of the court will be necessary.   I mention this as a reason for the long delay in deciding the case.

This is a suit in equity to enforce a constructive trust in favor of the complainant in certain lands and mines patented to the Mammoth Gold Mining Company, and which were afterwards conveyed to the defendant.   The material allegations of the bill, which are established by the evidence, are as follows:

In the year 1865, a certain quartz ledge in Plumas county, known as the "Mammoth Ledge," with the appurtenances thereto, 2,100 feet.

in length along the vein, was owned and possessed by James M. Thompson and John B. McGee, who severally mortgaged their interests therein to John Conly & Co. On November 4, 1865, said Thompson and McGee, in company with others, located an extension of said Mammoth ledge of the length of 2,000 feet, the title to nine-tenths of which has since passed by mesne conveyances to the complainant. After the location of said extension in the year 1867, said Thompson and McGee made a survey of their said claim, and also made at the Marysville land-office an application for a patent for the whole 4,100 feet of the ledge, including a tract of surface ground consisting of 252 95-100 acres, they at the time owning the whole, subject to said mortgages on 2,100 feet. Notice of the application for a patent was duly published, in pursuance of the statute, for the required period, and no adverse claims were filed. This survey and application covered the 2,100 feet mortgaged to Conly & Co., and the 2,000 feet subsequently located by Thompson and McGee. The act of congress of 1866 having been complied with, the right of Thompson and McGee to receive a patent to the whole of said tract became vested, as the result of said proceedings, upon payment of the purchase money required by law. The mortgages to Conly & Co., mentioned, of the original 2,100 feet were subsequently foreclosed, and title to the mortgaged premises passed by sale, under the decree of foreclosure, to Conly & Co., and, by subsequent conveyances, to the Mammoth Gold Mining Company, which, at the time of the issue to it of the patent in question, had no other title than that which passed under and by virtue of said mortgages and sale. The sale of the original Mammoth ledge of 2,100 feet, with the appurtenances, and the foreclosure having been made, said application for a patent was allowed to rest without further action until the year 1876. Conly, Tranor, and Luther, constituting the firm of Conly & Co., having conveyed to the Mammoth Gold Mining Company on June 9, 1870, the title to the 2,100 feet derived under the sale upon the foreclosure of their mortgages, seven years afterwards, in 1877, executed another deed to said corporation, whereby they sold, remised, and quitclaimed to said corporation all their right, title, and interest to the whole 4,100 feet. This deed contained this clause:

"A deed having been executed by the first parties to the second party, dated June 9, 1870, conveying two thousand one hundred linear feet of the said Mammoth quartz claim, the *intent of this indenture* is to vest in said second party all the title of said first parties of, in, and to the said Mammoth claim."

But neither at that time, nor at any other, did said grantors own any interest in any part of said claim except the 2,100 feet purchased under their decree of foreclosure, and they could not convey any interest in the other 2,000 feet. The Mammoth Company had sold all of its stock to the Plumas Eureka Company in the year 1872, and the latter company, which was beneficially owned and controlled by the corporation defendant, had taken possession of said original Mam-

moth ledge or claim of 2,100 feet, and the ground adjacent thereto, and made improvements thereon; but at that time took no possession of any other ground, made no efforts to do so, and expended nothing towards the working or development of the said extension to said ledge, which was not included in any conveyance to them, but was still owned and possessed by Thompson and his associates, who expended considerable money and labor, at various times, in endeavors to prospect the same; having, especially in 1875, erected a cabin, and run a tunnel of some 100 feet in length for the purpose of prospecting said extension, expending in the aggregate about $1,000.

In the fall of 1876 said Thompson proposed to the agents of the defendant, who were also at that time the agents of the Mammoth Company and of the Plumas Eureka Company, all of said corporations being at the time under the same control, that they should unite with him in perfecting the title to the whole of said 4,100 feet of ledge, according to the original locations and survey, and to said tract of 252 95-100 acres, by obtaining a patent therefor under the application of Thompson and McGee already made, with an agreement for an equitable division thereof according to their respective rights; but said agents declined the arrangement upon the plea that too much land had been included in the survey and application, and that the company would not pay five dollars per acre for it. Thompson, who seems to have been the active man, whether intentionally or not, was thus put off his guard, and led to suppose that the defendant's agents would have nothing to do with the survey and application of Thompson and McGee. Said agents of the defendant, however, soon after, in the early part of the following year, took measures to secure secretly, in the name of the Mammoth Company, a patent for the whole of said 4,100 feet of ledge, and tract of surface ground, upon the said original survey and application of Thompson and McGee, without the permission of or notice to Thompson or McGee, or any publication of their proceedings in any manner. They used and prosecuted Thompson's and McGee's survey and application, claiming to be successors in interest to the whole 4,100 feet. In order to make it appear to the land department that they were the successors in interest of Thompson and McGee to the whole of the ground, they first obtained the said quitclaim deed from Conly, Tranor, and Luther, the purchasers under foreclosure, several years after their conveyance of the original 2,100 feet, for the whole 4,100 feet of ledge, under the name and style of the "Mammoth Ledge;" said name having been applied to the whole 4,100 feet by Thompson and McGee in their application for a patent; whereas, in truth, said purchasers never had title of any kind to more than said 2,100 feet included in the mortgages of Thompson and McGee, and purchased by Conly & Co. under the decree of foreclosure as stated.

This quitclaim deed *was never recorded*, and all knowledge of its existence was withheld from Thompson and McGee, but was presented

to the land-office as a part of the chain of title of the Mammoth Company, which claimed the right to a patent as the successor in interest in the entire tract. The Mammoth Gold Mining Company used and prosecuted the application of Thompson and McGee, and appropriated their survey, acts, and work, by procuring a return of the field-notes of the original survey, made for Thompson and McGee by D. D. Brown, the deputy surveyor, which were approved by the surveyor general, for which return they paid Brown the sum of $250, under the caution, and with the express understanding, that he should keep his action secret from Thompson and McGee, which he agreed to do, and did do until long after the patent was obtained, and the facts were otherwise discovered. The patent was obtained without the knowledge of Thompson and McGee, May 18, 1877, in the unusually short time of less than four months after the commencement of their proceedings on it, and it was recorded in the following June. In December, 1877, Thompson employed men to resume annual work on the extension, without any actual knowledge of the patent, or any suspicion of the action of said corporation defendant and its officers. On the twenty-first of December, 1877, the men were ordered from the premises by the superintendent of the Plumas Eureka Company, under a notification, not that the Mammoth Company had obtained a patent under the application and survey of Thompson and McGee, but that "they," that is to say, the Plumas Eureka Company, "had located the ground last summer, and had got a patent for it." This was the first knowledge Thompson and McGee had of any adverse claim of title to the 2,000 feet extension in question. Work was resumed in another place during the following January, but no work was done after January. In the fall of the following year, Thompson, having heard that a patent for the ground had been obtained in the name of the Mammoth Company, but still in entire ignorance of the manner in which it had been obtained, began a series of inquiries into the matter. He first wrote, in the month of September, 1878, to the Marysville land-office, and was informed that the papers had been sent to Washington, and that a patent had been issued to the Mammoth Company, but not through that office. Thinking it might have been returned through the Susanville land-office, he then wrote to that office, but received assurance to the contrary, and was advised to write for information to the department at Washington. He then began a correspondence with the general land-office at Washington, which finally resulted in his obtaining an abstract from the general land-office, which, after considerable delay, for which he was not responsible, was received and read by him about Christmas day of the year 1878, which was the first disclosure to him of the main facts constituting the conduct of the defendant. He shortly afterwards consulted an attorney, who advised him that a legal fraud had been committed upon his rights. Meanwhile the agents who had been active participants in the procurement of the patent had ceased

their connection with the defendant, and a new agent had been appointed, who was absent from San Francisco, where Thompson resided, and where the defendant had its California office; the defendant being a foreign English corporation. Under the advice of a mutual friend of Thompson and of the English stockholders of the defendant, Thompson delayed action for the return of Mr. Coulter, the new agent of the defendant, indulging the hope that an adjustment of his claim might be effected without suit. Then began a series of negotiations and correspondence, which continued without any definite result being reached, until finally, an assignment having been made of the rights of Thompson and McGee to the plaintiff, this suit was instituted December 20, 1881, less than five years from the date of the patent, May 18, 1877; less than four years from the date of the ouster of December 21, 1877, and from the first knowledge by Thompson and McGee of the adverse claim set up by defendant; and less than three years from the actual discovery by Thompson and McGee, —December 25, 1878,—of the facts constituting the acts by means of which the patent was obtained.

The pleas of the defendant, besides a denial of the allegations of the bill, which allegations are satisfactorily proved, as above stated, are as follows: (1) *Bona fide* purchase by defendant for value, without notice; (2) abandonment and forfeiture by Thompson and McGee; (3) adverse possession by the Mammoth Company; (4) statute of limitations.

It seems to me clear that the complainant has a sufficient cause against the defendant for the enforcement of a constructive trust, unless the respondent satisfactorily establishes one of its affirmative defenses. The Civil Code, § 2224, declares that "one who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or *other wrongful acts*, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Where one party wrongfully obtains the legal title to land, which in equity and good conscience belongs to another, whether he acts in good faith or otherwise, he will be charged in equity as a constructive trustee of the equitable owner. That, I think, is a doctrine established by the following cases: *Wilson* v. *Castro,* 31 Cal. 420; *Salmon* v. *Symonds,* 30 Cal. 301: *Bludworth* v. *Lake,* 33 Cal. 256; *Hardy* v. *Harbin,* 4 Sawy. 549; the latter being a decision of Mr. Justice FIELD on the circuit.

Under these authorities, unless defendant has satisfactorily established one of its affirmative defenses, complainant is entitled to a decree for a conveyance from the defendant of nine-tenths of the 2,000 feet extension of the Mammoth quartz ledge, and of the proper proportion of the surface ground fronting upon and adjoining the extension included in the patent.

I think the defendant's plea for protection as a *bona fide* purchaser for value, without notice, fails under the proofs in the case. That

plea involves two questions: (1) of payment of value; (2) of notice; both of which must be resolved in favor of the defendant in order to support the plea; but neither of which can be so resolved upon the proofs. The burden is on the defendant to prove that some new and valuable consideration passed from it in the purchase of the property after the equity of Thompson and McGee had accrued. An acknowledgment of payment in a deed is no evidence of such payment as against the owner of a prior equity. *Colton* v. *Seavey,* 22 Cal. 497; *Long* v. *Dollarhide,* 24 Cal. 218; *Galland* v. *Jackman,* 26 Cal. 80; *Boone* v. *Chiles,* 10 Pet. 177, 211.

The testimony in this case fully shows that the whole beneficial ownership of the original Mammoth mine, as well as of the Plumas Eureka mine, had passed to the corporation defendant as early as 1872; therefore that there could not, in reason, have been the payment of any new or valuable consideration to the Mammoth Company by the Plumas Eureka Company, or to the Plumas Eureka Company by the defendant, after the issue of the patent, which made the Mammoth Company the constructive trustee of Thompson and McGee. There is no pretense of affirmative evidence on the part of the defendant that any purchase money passed upon the transfer of the patent to the Plumas Eureka Company or to the defendant; but, on the contrary, the defendant's own testimony proves that all of the expense of procuring said patent, in the name of the Mammoth Company, was paid by the agents of the defendant out of the proceeds of the Plumas Eureka mine, which was under the ownership and control of the defendant. This fully negatives the defense of *bona fide* purchase for value. But if there were no such evidence, there is nothing to show that value was in fact paid, and the defense would fail.

As regards the question of notice, the defense equally fails; for it is well settled that the knowledge of an agent, in respect to the subject-matter of his agency, is the knowledge of the principal; so that, in view of the fact that the agents of the Mammoth Company were also agents of the Plumas Eureka Company, and agents of the corporation defendant, in respect to the same subject-matter, and performed all of their acts for the immediate benefit of the defendant, and at its expense, it is fully chargeable with knowledge of their acts, and with all equities arising therefrom. Indeed, their acts were the acts of the corporation defendant. *May* v. *Borel,* 12 Cal. 91; *Bierce* v. *Red Bluff Hotel Co.,* 31 Cal. 161; Story, Ag. § 140.

The truth doubtless is that these corporations, in substance and fact, were simply using the California corporation through which to secure the title for the defendant itself, which was a London corporation, and there was a difficulty under the statute in the way of procuring title to itself directly from the United States. Hence it was so arranged that the patent should issue to the Mammoth Company, which was an American corporation, and entitled to obtain a patent. It is not doubted that that corporation was used as an instrumental-

ity for obtaining the title for the benefit of the defendant in this case. That defense, also, has clearly failed.

As to abandonment, there was manifestly none. Abandonment is a voluntary act, and there is no evidence to justify the court in finding that these parties abandoned their rights. *Moon* v. *Rollins,* 36 Cal. 333; *Richardson* v. *McNulty,* 24 Cal. 345; *St. John* v. *Kidd,* 26 Cal. 271, 272. It is not necessary to enlarge on that proposition.

It is said, also, that the claim was forfeited by those parties not working it annually as required by the statute. That is a matter, I take it, in this case, of not the slightest consequence. There was no evidence that the Mammoth Company took up the claim on the ground that it had been forfeited or any other, and until some one did enter, the complainants, under the provisions of the statute itself, could re-enter and resume work at any time before other rights attached in favor of subsequent locators. So the statute provides. *Jupiter Min. Co.* v. *Bodie Con. Min. Co.,* 7 Sawy. 98; S. C. 11 Fed. Rep. 666; *North Noonday Min. Co.* v. *Orient Min. Co.,* 6 Sawy. 301; S. C. 1 Fed. Rep. 522. At all events, these parties had no title acquired in that way. They obtained the title through Thompson and McGee upon their own survey and application. They went in and prosecuted the application of Thompson and McGee as successors in interest to Thompson and McGee, and not as adverse claimants on another independent title. The right which was good enough to enable defendant to obtain a patent for the benefit of the company was certainly good enough for Thompson and McGee to obtain a patent on for themselves. Their right to a patent was perfected under their survey, application, and publication of notice; there having been no adverse claims filed. The defendant is surely not in a position to say that Thompson and McGee had no title, because that was the very title which the corporation itself has got, and the only title on which it relied, or could have relied, to procure a patent as to the extension. It does not lie in defendant's mouth, therefore, to say that Thompson and McGee had forfeited their claim, and were not entitled to obtain this patent. Defendant did in fact obtain it, and did secure the patent, through Thompson and McGee, and through them alone. Since the proofs have come in on the argument, the respondent really does not make any stand on any of those propositions. They were substantially treated as abandoned, and were really not pressed or relied on, as they could not well honestly have been.

Defendant's counsel now rely mainly on adverse possession, and the statute of limitations; and they endeavor to plead the statute of limitations. This is the defense, and only defense, earnestly pressed. This is an equity case, and the statute of limitations, as such, is not a defense in a court of equity of the United States. On the equity side of this court the only defense is laches in not pursuing the party's remedy for such time and under such circumstances as renders it inequitable to grant the desired relief—that the claim has be-

come stale, so as to render it inequitable to enforce it. A court of equity, in analogy to the statute of limitations, usually adopts the statute as a limit to the time for enforcing the claim unless there are other equitable circumstances which are deemed sufficient to relieve the party claiming the right from the charge and consequences of laches. In this case the defendant undertakes to set up the statute of limitations as a statute of limitations, and, as such, a bar to the suit. It is claimed by complainant that the statute is insufficiently pleaded, the defense being alleged in the form authorized by the state Code of Civil Procedure: "that the cause of suit is barred by section 343 of the Code of Civil Procedure of the state of California." That is simply and purely a plea of the statute of limitations in the form which is recognized by the state practice, but which is not adopted in this court, as the Code of Civil Procedure has no application on the equity side of the court. The defendant has also, in another form, attempted to set up the facts which show an adverse possession for the period prescribed by the statute, in addition to pleading the statute of limitations in the form prescribed by the Code.

Staleness or laches are not alleged in any other way than as thus indicated. But no formal plea of the statute of limitations or of the special facts is necessary to raise the defense of laches, neglect, or acquiescence in a court of equity. These defenses are peculiar to courts of equity, and will be enforced in proper cases, wherein the facts appearing call for it, whether they arise upon the bill and pleadings presented to the court, or upon the whole case as disclosed by the evidence. The court will often take notice of it, even though the objection is not made by the parties. *Pratt* v. *California Min. Co.*, 9 Sawy. 363, 365; S. C. 24 Fed. Rep. 869, and cases cited; *Badger* v. *Badger*, 2 Wall. 87; *Sullivan* v. *Portland, etc.*, 94 U. S. 811.

Regarding this defense as properly before the court, and adopting the statute of limitations by analogy, under which provision of the statute does this case fall? In the first place, the complainant insists on the five-years limit. This suit, it is insisted, is, in substance and in fact, equivalent to an action to recover the premises, as the necessary effect will be to ultimately give possession of the premises to the complainant; and it is insisted that, this being so, the same limit should be adopted as in an action at law to recover the property, and a large number of authorities is cited to sustain that proposition. They are as follows: *Oakland* v. *Carpentier*, 13 Cal. 540; *Elmendorf* v. *Taylor*, 10 Wheat. 152; *Miller's Heirs* v. *McIntyre*, 6 Pet. 61; *Manning* v. *Hayden*, 5 Sawy. 360, 379; *Love* v. *Watkins*, 40 Cal. 547, 570; *Coulson* v. *Walton*, 9 Pet. 62; *Harris* v. *King*, 16 Ark. 122; *Ward* v. *Van Bokkelen*, 1 Paige, 100; *Walker* v. *Walker*, 16 Serg. & R. 379; *Ferris* v. *Henderson*, 12 Pa. St. 54; *Paschall* v. *Hinderer*, 28 Ohio St. 568; *Perry* v. *Craig*, 3 Mo. 525; *McDowell* v. *Goldsmith*, 2 Md. Ch. 370; *Field* v. *Wilson*, 6 B. Mon. 479; *Murphy* v. *Blair*, 12 Ind. 184; *Weaver* v. *Froman*, 6 J. J. Marsh. 213; *Varick* v. *Edwards*,

11 Paige, 289; *Baker* v. *Whiting,* 3 Sum. 475; *Boone* v. *Chiles,* 10 Pet. 177.

But under the view I take, it will not be necessary to decide whether that provision is applicable or not; for it is next claimed by the complainant, and I think correctly, that if the five-years limit is not applicable, then the four-years limitation is under the general claim that the limitation shall be four years in all cases not otherwise provided for. In response to this, the respondent asserts that the case falls under the provision making the limitation three years, as being a suit "for relief on the ground of fraud;" that the ground of the suit is fraud in obtaining the title. "Suppose that to be so," the complainant replies, "I did not discover the acts constituting the fraud until within three years after the perpetration of the fraud." In my judgment, the four-years limitation applies if the five-years limitation does not.

In support of the point made that the bill is insufficient, and requires amendment, the respondent's counsel inconsistently, in their brief, say that the theory of the bill is *not fraud,* but that it is well stated in the plaintiff's brief, page 8:

"Where one party wrongfully obtains the legal title to land which, in equity and good conscience, belongs to another, *whether he acts in good faith or otherwise,* he will be charged in equity as a constructive trustee in favor of the equitable owner."

This, the respondent insists, is the theory of the bill, and such I also think is its theory. Respondent objected to certain testimony, which is claimed to show acts of fraud, if acts of fraud there are, on the ground that no fraud has been alleged, and consequently no evidence of fraud can be introduced, and no evidence as to the time when the fraud was discovered. The defendant having set up the statute of limitations in its answer, it is insisted that the complainant should have amended his bill, showing when the fraud was discovered. On looking at the bill I do not find that the acts are charged as fraudulent. There is no charge of fraud in express terms. The acts may, nevertheless, appear to be fraudulent. The facts are stated to show in what manner the title was wrongfully obtained. It is not necessary for me to decide now whether these acts would constitute a technical fraud on which a bill could be maintained as such or not. The acts are not alleged to be fraudulent in express terms. The simple facts are stated upon the other theory indicated, without characterization, to show that the title had been wrongfully obtained. There was no relation of confidence or trust between these parties, and none alleged or claimed to exist. They were not dealing at all with each other. Defendant made no representations to the complainant on which he relied, unless a refusal to join in procuring the title jointly, and a statement, after the patent was procured, that the Plumas Eureka Company had obtained the patent on a new location, can be so regarded. When the first statement was

made defendant may not have intended to procure the title. But the last was after the wrong had been consummated, and evidently designed to mislead and prevent Thompson from ascertaining the real facts, to throw him off the proper line of investigation. No promise was made to or procured from him. The respondent simply declined to go in with Thompson and obtain the title, and then divide according to their several interests. But defendant afterwards went secretly, and clandestinely obtained the title to the whole for itself upon Thompson's and McGee's right and application. Undoubtedly the title was secretly, surreptitiously, and wrongfully obtained. There being no relation of trust or confidence between the parties, no false representation, no affirmative acts known to Thompson and McGee, performed for the purpose of inducing them not to proceed with their own claim, and the defendant having simply gone and quietly, secretly, and surreptitiously appropriated their application and claim, and obtained a patent, it may be that their acts would not constitute a *technical fraud* within the law. I have not looked the question up, and I do not propose to decide it. But whether a technical fraud or not, it certainly comes within the clause of the statute which I have just read, that "one who gains a thing by '*other wrongful acts*' becomes an involuntary trustee." Here is certainly a wrongful act. The act of thus appropriating the property of another in a secret manner, without his knowledge or consent, was manifestly and unquestionably tortious. Through these wrongful acts the defendant obtained the complainant's title. If we concede that the bill might be maintained on the theory of fraud, that does not prevent complainant from maintaining his bill on the other ground of suit as alleged: the wrongful acts of the character shown, by means of which the complainant's title was surreptitiously obtained. In my judgment the case made upon the theory alleged in the bill, and established by the proof, falls within the provision of the section which says that four years shall be the limitation; this cause of suit not being otherwise provided for. Such being the limitation, the four years had not expired on December 25, 1878, when Thompson and McGee first learned of these wrongful acts, and up to that time the wrongful proceedings were concealed by the party performing these tortious acts and committing the injury. Up to that time Thompson and McGee had no knowledge that their rights had been invaded; that they had been thus deprived of their right to obtain a patent. Of course, if we consider the cause of action barred in four years, in equity the parties could not be chargeable with neglect in enforcing their rights until they knew they had been violated, and at the time of their ouster the matter was for the first time brought to their knowledge. That was within four years of the commencement of this suit. They continued in possession, constructively at least, and on December 21, 1877, were in the actual possession and occupation of their claim by men working upon it. They therefore remained in possession of

their mining claim until December 21, 1877, when their men were forbidden to work, and compelled to leave the ground, at a time when they were actually in possession and at work. They were informed at the time that defendant claimed title under a patent to the Plumas Eureka Company, obtained on a new location. These acts constituted an ouster, and it was less than four years before the commencement of the suit. Upon well-settled principles of law the statute does not begin to run against a *cestui que trust* in possession until the date of his ouster therefrom, no matter whether the trust be express or implied. *Love* v. *Watkins*, 40 Cal. 569; *McCauley* v. *Harvey*, 49 Cal. 497; *Altschul* v. *Polack*, 55 Cal. 633.

The defendant having wrongfully obtained the title of Thompson and McGee in the manner stated, a trust resulted in their favor, and they were the *cestuis que trust* of the 2,000 feet extension, in possession of the trust property, and were not ousted until the twenty-first of December, 1877. I think, therefore, that their equities are not cut off by their laches in not pursuing their claim at an earlier date.

Again, in considering this defense, courts of equity will take all the circumstances into consideration. Thompson did not, it is true, immediately commence his correspondence after notice of the adverse claim. He did, however, within a few months. Not many months after he obtained knowledge of the condition of things through correspondence with the local land-offices, and afterwards with the general land-office, he applied for and ultimately obtained a transcript of the record from Washington, showing that the Mammoth Company had obtained a patent on his and McGee's title; that there were false representations made to the land-office. When ejected, Thompson, through his men, was informed that the Plumas Eureka Company had obtained the title upon a new location of their own. These were false representations undoubtedly, which tended to put the parties off the proper line of inquiry to find out what the facts were; and they would naturally have sought to ascertain what the Plumas Eureka, instead of the Mammoth Company, had done. Within a very few months they commenced their inquiries. In December they were ousted, and as soon as the real facts were ascertained, they commenced negotiations with defendant for a recovery or a settlement of their rights. Negotiations continued along for some considerable time. There was correspondence between the London office and the parties here, and there was reason to suppose a compromise might be effected. The negotiations seem to have been friendly, and not of a malicious or irritating character. Thompson and McGee were negotiating continually, all along pressing their claim. Finally they informed the defendant that they must either come to some settlement, or they would be compelled to commence proceedings, to avoid the statute of limitations. They evidently intended to keep, and supposed they had kept, within the statute all the time until the suit was commenced.

As I remarked in the opening, since the case was submitted for de-

cision, over a year ago, negotiations have been pending, but have been fruitless. Those facts should be taken into consideration, I think, in determining the question whether the rights of this complainant have been forfeited by their laches. They have indicated no intention to abandon their claim, but, on the contrary, at all times manifested a purpose to insist upon and maintain their rights. I am satisfied, if the five-years limitation is not the clause applicable, the four-years clause is, and that complainant is within the time, taking all the circumstances surrounding the transaction into consideration. The fact that they did not discover or have any intimation of the condition of things until they were ousted in December, 1877, is highly important, and indicates the earliest time at which the statute could commence to run. Even if the three-years limitation be applicable, the statute provides that the time shall not begin to run "until the discovery of the *facts* constituting the fraud." In this case, the "*facts* constituting the fraud" were not actually discovered till within three years of the commencement of this suit. There was some little delay at first in pursuing such false clue to the facts as had been given. But here Thompson and McGee were put upon the wrong line of investigation by false statements. They were also subsequently encouraged to hope for an amicable settlement by prolonged negotiations. If the suit must be regarded as seeking "relief on the ground of fraud," the facts disclosed are such as excuse delay, and, under all circumstances, in my judgment, would render it inequitable to apply the three-years limitation. But if applied, the time should commence to run at the time of the discovery of the facts constituting the fraud. There must therefore be a decree for the complainant in pursuance of the prayer of the bill.

There is one branch upon which I am not at present sufficiently advised to enable me to make a proper decree: that in reference to the surface ground patented in connection with the mine. There are 250 odd acres of surface ground, very irregular in shape. There is a mill on some portion of it, erected by the defendant since obtaining the patent. Whether that mill is on ground which the complainant is entitled to have or not, I am not advised in the present state of the record. Certainly, if it can be done without wrong to the complainant, the defendant ought to be able to retain that mill. I do not know, from the testimony, where the mill is in fact located. The land is so irregular in shape that it is not very clear where the lead runs, and where the 2,100 feet end, and the other begins. The land is not in the form of a parallelogram along the line of the lode, within definite, fixed, straight lines, but there are all sorts of angles. Much of it is a long way outside of the lode, and I am not prepared to say what part of the land should pertain to the 2,100 feet, and what part should go with the 2,000 feet. If the parties cannot arrange that matter among themselves before settling the decree, I shall be compelled to refer the matter to the master in order to ascertain and

report the exact condition of these matters; the location of the mill; how it is situated, with relation to the 2,000 feet and in relation to the 2,100 feet; how, in relation to a line of division drawn directly across the proper point, if there can be a line so drawn; and how much of the land is adjacent to the 2,100 feet. These questions will have to be determined unless the parties themselves can come to some understanding on the subject, and I shall have to refer the matter to the master to ascertain the facts. If necessary, counsel will have to draw an order for that purpose. There will be a decree for the complainant for the conveyence of the portion of the ledge to which he is entitled, and such portion of the surface land as may be ascertained to properly belong to the 2,000 feet.

There is one other remark I wish to make. It is alleged that it was not averred in the bill that this patent was obtained without notice of Thompson and McGee. There is no direct averment of that fact, but there is an averment that it was obtained without the permission of the plaintiff's grantors, and against their will, and it is clearly inferable from the other allegations that it was without notice in fact. I think that the testimony objected to is admissible, under the allegations of the bill, as showing the circumstances under which the patent was wrongfully obtained, and I think that, of itself, would be sufficient; but it is a mere formal, technical objection. It is inferable from all the allegations of the bill that it was without notice, and stated to be without permission. I am disposed to think it is not necessary to amend the bill; but if complainant desires to amend by alleging that the patent was obtained without notice, for greater safety, they have leave to do so. The proof must have been the same with or without the allegation, and the defendant can in no way be injured by the amendment. Defendant can amend his bill to correspond with the proof that the patent was obtained without notice to Thompson and McGee. There is authority for this in the case of *Neale* v. *Neales*, 9 Wall. 1, 9.

In my judgment it is not necessary; but if complainant desires to make an amendment he can do so.