**CULL et al. v. CAVANAUGH et al.**

No. 11482—Opinion Filed June 19, 1923.

Rehearing Denied July 31, 1923.

Second Rehearing Denied Sept. 25, 1923.

(Syllabus.)

**1. Appeal and Error—Review of Equity Case—Findings.**

In an action for equitable relief a finding of facts by the court upon conflicting testimony will not be disturbed by this court, unless against the clear weight of the evidence.

**2. Fraud—Relief—Equity Powers of District Court.**

In an action for relief from fraud, where the allegations consist of facts constituting fraud, that such fraud will continue unless relief is granted, and a relief is of such character as only a court of equity can give, the district court of this state, being vested, both with the powers of a court of law and equity, will exercise its equity powers in granting proper relief.

**3. Same—Character of Action—Materiality.**

It is not essential to equitable relief that an action be to enforce an express trust or to have declared a resulting trust or for the enforcement or annulment of a contract, nor that the fraud be of a particular character; it will suffice in equity if fraud has been designedly perpetrated to the substantial detriment of the defrauded party and the law is inadequate to a proper relief.

**4. Same—Fraud of Joint Adventurer—Relief—Title—Constructive Trust.**

Where two parties agree upon a joint venture, each to contribute an equal sum, and title is taken in the name of one, but paid for with the money of the other, where the one contributes nothing toward the purchase price and where every effort contributed and all time devoted by the one is for the apparent purpose of effectuating his intended fraud, equity will arrest such fraud and decree title to such property in the party whose money purchased it, together with the profits which his money has earned.

Error from District Court, Tulsa County; Owen Owen, Judge.

Action by N. B. Cavanaugh and others against M. E. Cull and others to recover interest in oil property. Judgment for plaintiffs, and defendants bring error. Affirmed.

Foster & Feuquay and S. A. Horton, for plaintiffs in error.

Breckenridge, Bostick & Daniel and Pat Malloy, for defendants in error.

HARRISON, J. This was a suit to have certain deeds and oil and gas leases declared to be conveyances in trust, and to have plaintiffs' interest in same determined and decreed. It was instituted by N. B. Cavanaugh, L. A. O'Connell, J. V. Sharp, James Kelly, J. W. O'Connell, J. M. Camalier, and George Hock, plaintiffs, against M. E. Cull, M. B. Cull, E. C. Cull, Cull Oil Company, a corporation, Mary Anglefinger, James Russell, Catherine Russell, James T. Quinn, Patrick McKenna, Patrick Fitzpatrick, Elizabeth Lovell, Anna Marie Keith, Patrick Madden and W. N. Harsha, defendants.

Plaintiffs were residents of Pittsburg, Pa., and all except George Hock were clergymen. The gist of their allegations was that defendants M. E. Cull, M. B. Cull, and E. C. Cull had represented to plaintiffs that they, the Culls, knew of opportunities for making great profits by investment in oil leases in Oklahoma; that M. E. Cull was an experienced oil man, had made a large fortune in the oil business, and was in position to secure oil properties that would prove to be profitable investments, and proposed a joint adventure in the oil business with plaintiffs; that if plaintiffs would contribute a certain amount of money, defendants Cull would put up an equal amount and would invest the total sum in oil properties in Oklahoma and take joint conveyances to same in the name of all the parties contributing; that relying upon such promises, plaintiffs contributed the several amounts alleged in their petition, but defendants contributed nothing; that defendants took the money which plaintiffs contributed, purchased various tracts of lands and oil and gas leases with the plaintiffs' money, and at much lower prices than defendants had represented such properties would cost; that instead of procuring joint conveyances, as plaintiffs had been lead to believe would be done, defendants procured conveyances in their own names; that though defendants had contributed none of the purchase price of such properties, and though same had been paid for with plaintiffs' money, and though they had been purchased at far less figures than plaintiffs had been lead to believe they would cost, yet defendants had not accounted to plaintiffs for the balance of money paid to defendants by plaintiffs, but had embezzled same and converted same, amounting to several thousands of dollars, to defendants' own use and benefit. Having been thus defrauded, plaintiffs sought relief by this suit.

The issues of fact and the effect of the testimony upon such issues are stated in the court's findings of fact as follows:

"Journal Entry of Judgment.

"Now, on this 2nd day of July, 1919, this cause coming on to be heard in its regular order, and the plaintiffs appearing by their attorney, Pat Malloy, and the defendants, M. B. Cull, Mary Anglefinger, James Russell, Catherine Russell and James T. Quinn, sometimes in the cause referred to as cross-petitioners, and defendants appearing by their attorney W. J. Gregg, and defendants, M. E. Cull and E. C. Cull and and the Cull Oil Company, a corporation, appearing by their attorneys, Davidson & Williams, and

the defendants, Dunnigan, having heretofore entered his appearance in this cause and filed his disclaimer herein and the defendants having announced ready for trial in open court, and waive a trial of this issue involved in the case by a jury and agreed to a trial of the same by the court. Said cause was heard and the trial thereof had, and the court having heard the evidence and argument of counsel and considered the same and being fully advised in the premises, finds:

"First: M. E. Cull was a resident of Oklahoma and lived at or near all of the property involved in this litigation during all of the times mentioned. The plaintiffs and M. B. Cull were residents of Pittsburg, Pa., and adjoining towns, and are wholly unacquainted and inexperienced in the oil business. M. E. Cull had experience in the oil business and held himself out by representation to the plaintiffs and M. B. Cull as being the owner of production and expert in the oil and familiar with the value of oil properties and experienced in the operation thereof.

"Second: That the allegations of plaintiff petition are true ,except as in this finding stated. The court find that in November, 1913, the defendant, M. E. Cull, through his cousin, M. B. Cull, represented to the plaintiffs, N. B. Cavanaugh, L. A. O'Connell, J. V. Sharp, James Kelly, J. M. Camalier, and George Rock, that an oil and gas lease covering the Timothy Asbury allotment described in the petition could be purchased or acquired for $2,400; that the purchase could and would be made as a joint venture, in which M. E. Cull, M. B. Cull and the plaintiffs last named would acquire by such purchase an interest in said lease proportionate to their contributions thereto, which interest and contributions would be as follows: M. E. Cull, an undivided one-fourth; M. B. Cull, an undivided one-fourth; and the plaintiffs so named, an undivided one-half, which undivided one-half interest should be apportioned among said plaintiffs named according to their contribution to the fund of $2,400.

"The court finds that the representations made by M. E. Cull and so communicated to said named plaintiffs by M. B. Cull as aforesaid were that the plaintiffs so named and M. B. Cull should come in on what was known as the "ground floor" and acquire their respective interests in the lease at cost. Relying upon the truth of these representations the plaintiffs so named jointly contributed $1,200; M. B. Cull $600, and M. E. Cull nothing.

"The court finds that the lease in fact cost M. E. Cull but $100. The sum of $1,800 so raised was delivered to M. E. Cull.

"The representations so made by him, therefore, on a material fact, to wit, the cost of the lease, was false and fraudulent and was relied upon by the parties so contributing as set forth to their injury. The defendant, M. E. Cull was, therefore, guilty of fraud. It was an active fraud. At the time of the institution of the suit, the legal or record title in this lease was as follows: M. E. Cull, 1-4; M. B. Cull, 1-4; N. B. Cavanaugh, 1-16; L. A. O'Connell, 1-8; J. V. Sharp, 1-16; James Kelley, 1-8; J. M. Camalier, 1-16; George Hock, 1-16.

"Third: In February, 1913, at the request of M. E. Cull, the parties named as holding interests in said Timothy Asbury lease, agreed and determined to drill a well on same. M. E. Cull represented to M. B. Cull, and through him to the plaintiffs holding such interest in said lease, that the cost of drilling said well would be about $3,200 and assessments were made accordingly by M. E. Cull. Of that amount, the plaintiffs so named contributed in the months of March and April, 1914, one-half, M. B. Cull, one-fourth. The money so raised was delivered to M. E. Cull. M. E. Cull contributed nothing. The representations made by him, therefore, in this connection were false and fraudulent in that he did not and it was not his intent to contribute any part of said $3,200. The money was paid to him upon the faith of said representation. The said M. E. Cull was, therefore, guilty of fraud. It was an active fraud.

"At the instance of M. E. Cull, about April, 1914, after the receipt of said monies, it was decided by the parties that instead of drilling a well on the said Asbury lease, a well should be drilled on the Rayford Pouncil allotment described in the petition; such well to be drilled under a contract with the owner, the Mooney Oil & Gas Company, for an undivided one-half interest in the Rayford & St. Pouncil leases. A contract was executed with the said Mooney Oil & Gas Company and M. E. Cull. For the purpose of performing the terms of said contract, the said M. E. Cull purchased a Standard drilling rig with which to deepen a gas well on said Rayford Pouncil lease to the oil sand. The rig was paid for by M. E. Cull but with monies received from the plaintiffs so named and M. B. Cull. No assignment at the time of said undivided one-half interest in said Pouncil leases was delivered. After the oil sand was found in said well so drilled, the said M. E. Cull stopped further development pending negotiations with the owner for the other undivided one-half interest and some adjoining leases.

"M. E. Cull represented to M. B. Cull, with the request that such representations be communicated to the plaintiffs, that the other one-half interest in the leases described could be acquired for the sum of $12,000, and that the plaintiffs proportionate part of said sum would be on the same basis as

their holdings in the Asbury lease or $6000; that towards said sum M. B. Cull should be assessed and required to pay $3,000 and M. E. Cull should be assessed and required to pay $3,000. M. B. Cull, at the time these representations were made, was in Tulsa, Okla., and went to Pittsburg to confer with the plaintiffs in this action upon the proposition and there communicated to them the representations made to him by M. E. Cull; that the plaintiffs among them raised on the faith of this representation $6,000 and delivered the same in the early part of June, through M. B. Cull, to M. E. Cull. M. E. Cull purchased from the said owner of said Pouncil leases, the Mooney Oil and Gas Company, all of the interests in said two Pouncil leases and the same was transferred by assignment and also the oil and gas lease covering the Allen Grayson allotment described in the petition and took by warranty deed an undivided one-half interest of the fee of the Timothy Asbury allotment described. The cost of said property so acquired was not, however, $12,000 as represented by M. E. Cull to the plaintiffs, but $1,500: the representations therefore, made by M. E. Cull as to the purchase and acquirement of these properties, were false and fraudulent and were relied upon by the parties so contributing to their injury. The said M. E. Cull was guilty of fraud. It was an active fraud. Said sum of $6,000 so furnished by the plaintiffs was used in paying the price for these properties to the Mooney Oil & Gas Company. Towards this purchase, M. E. Cull contributed nothing and M. B. Cull contributed nothing. The deal was consummated about June 27, 1914. About the same time, the said M. E. Cull acquired in his own name two leases adjoining the Pouncil property, to wit: The Ethel and Leroy Mason leases which are described in the petition.

"On July 13, 1914, the said M. E. Cull, out of the monies contributed by the plaintiffs, to wit: the said sum of $6,000 paid the purchase price on said Leroy and Ethel Mason leases, and neither M. B. Cull nor M. E. Cull contributed anything thereto. The title in said Mason leases was taken in the name of M. E. Cull and remained in his name at the time of the trial of this cause. The title to said Allen Grayson lease was likewise taken in the name of M. E. Cull, but pending this suit and subsequent to its institution, he sold the same for the sum of $24,000: $10,000 which he received in cash, and $14,000 to be paid in oil The said lease did not procure oil and M. E. Cull has received no monies on account of oil produced therefrom.

"Three producing wells have been drilled upon the said Rayford Pouncil allotment, and oil marketed therefrom and the same are producing at the time of this trial. The production of lease was connected to the pipe line in December, 1914, but short-

ly afterwards the said M. E. Cull, E. C. Cull, with the knowledge and assent of M. B. Cull, but over the protest and objection of the plaintiffs, caused the defendant, the Cull Oil Company, to be incorporated and shares of stock issued thereby in the name of the parties to this action, and the said M. E. Cull thereafter caused the title therein to be transferred to the Cull Oil Company and the legal title thereto is at the date of this trial in the name of the said Cull Oil Company; that the plaintiffs objected and protested against the organization of said company and refused to accept any shares of stock therein or to recognize it or to consent to a transfer of the title in the Pouncil leases thereto; that a receiver was appointed in this action on the 18th day of December, 1915, and such receiver took possession of said properties on the 24th day of May, 1916; that the said defendant, E. C. Cull, as treasurer of said Cull Oil Company, had on hand to the credit of said company from the sales of oil at the time said receiver took possession of said property—$3,015.12, of which sum he appropriated $1,100, placed it to his own credit and never has accounted to the receiver nor any other person in this action.

"The court finds further that the plaintiff, J. W. O'Connell, contributed $1,500 towards the sum of $6,000 delivered to the said M. E. Cull in June, 1914, and by him used in the purchase of the leases and property set forth in the petition and in this finding of facts."

From the foregoing findings of fact the court reached the following conclusions of law:

"Conclusions of Law.

"The purchase and acquirement of all properties described in plaintiffs' petition was a joint venture on the part of the plaintiffs named and M. E. Cull and M. B. Cull. Each of the parties owed to the other his utmost good faith in the transaction and no one of them had the right to secure any private advantage to himself. The plaintiffs and M. B. Cull have furnished the entire consideration for the purchase of all the property described and are entitled to a conveyance to them of all of the title in all of said properties described proportionately to their contribution thereto. The defendants M. E. Cull and the Cull Oil Company and M. C. Cull, being guilty of fraud and misrepresentation and having contributed nothing towards the purchase nor preservation of the property, are not entitled in law nor equity to any interest therein."

The facts found by the trial court are, in our opinion, supported by the clear weight of evidence in the case, and will not be disturbed.

From the facts thus found the court reached the above conclusions of law, decreed to

the parties the respective interest in the several properties; that is, to each of those who had contributed to the venture he decreed an interest in proportion to the amount contributed; and having found that neither M. E. Cull, E. C. Cull nor the Cull Oil Company had contributed anything, decreed that they had no interest in the properties, and likewise decreed that the defendants had no interest. So far as the decree affects other defendants than M. E. Cull, E. C. Cull, and the Cull Oil Company, it is immaterial here, as such other defendants are not complaining and have not appealed. The controversy here is between M. E. Cull, E. C. Cull, and the Cull Oil Company, plaintiffs in error, against defendants in error, the parties to whom an interest in the property was decreed.

In plaintiffs in error's brief complaint is made that the court erroneously excluded plaintiffs in error from any interest in the property, or any benefit they might have secured by reason of owning the property, or any interest for drilling any wells or any other interest. This complaint is disposed of by the facts that plaintiff in error contributed no money to the purchase price of the several properties involved, but procured the monies with which such properties were purchased from plaintiffs by means of false representations with intent to defraud, and by taking the title to same in their own name as a means of accomplishing their fraudulent purpose. Therefore, they owned no interest, either in law or equity, in said property, and having bought such property with plaintiffs' money at a price far less than they represented its cost to be, and having embezzled the balance which plaintiffs had contributed and converted to their own use, or to the purpose of carrying out their intended fraud, they are held to have contributed nothing and to be entitled to nothing. It is apparent that, whatever efforts they contributed, whatever time they devoted, was all contributed and devoted to the furtherance of their intended fraud. It is not denied that plaintiffs below contributed $7,800; it is also apparent that the several conveyances were to be made jointly to plaintiffs below and to M. E. Cull and E. C. Cull, and cannot be denied that all of such conveyances were taken in Cull's own name. Upon these facts they owned no interest in said property, either in law or equity. The very fact of the title being in their own name is conclusive of their intent to defraud, and their overt attempt to defraud, and but for the powers of a court of equity to do justice under the facts presented their intended fraud would

have been effectually consummated and plaintiffs below would have been forever defrauded of every cent they had contributed to the enterprise, as well as of the profits which their money had earned.

In plaintiffs in error's brief it is said:

"It is not clear whether the court held that the facts constituted a constructive trust or a resulting trust; the fact is, according to plaintiffs' contention in this case, if it amounted to anything, it was an express trust."

And it says further:

"That there was not any confidential relation existing between the plaintiffs in error and defendants in error."

The foregoing contentions cannot be sustained under the record. It is clear from the record and the court's finding of facts that the actions of M. E. Cull and E. C. Cull, taken all together, constituted actual fraud, and that such fraud would continue unless under such a condition equity will respond to the prayer for relief—and relief was granted—and constructs a trust for the benefit of those defrauded, and we think the court correctly enforced such trust in decreeing the entire interest in the property to those who had furnished the money and who had been thus defrauded, and in decreeing that those who had perpetrated the fraud had no interest in the property.

It is also clear from the finding of facts and conclusions of law that the judgment herein was in the enforcement of a constructive trust. The suit was not brought for the purpose of enforcing an express trust. Plaintiffs below stated the acts constituting a fraud upon them and the various actions and course of conduct of the Culls in their attempts to carry out their intended fraud, showed that such fraud would continue unless relief were granted, and in effect asked the court for no more than such relief as plaintiffs might show themselves entitled to receive. The petition and prayer is directed to equity. The rules of equity were invoked and the powers of a court of equity were appealed to for relief from the state of facts alleged, and, under our law, the district court, being vested with both the powers of a court of law and powers of a court of equity, exercised its equity powers in granting proper relief. It is not essential to equitable relief that an action be to enforce an express trust, or to declare a resulting trust or for the enforcement or annulment of a contract, nor that the fraud be of a particular character. It will suffice in equity if fraud has been designedly per-

petrated to the substantial detriment of the defrauded party and the law is inadequate to proper relief.

In 26 R. C. L., page 1235, sec. 81, it is said:

"Actual fraud, intentional as regards the party seeking relief, is not essential to the raising up of a constructive trust any more than an equitable estoppel. If one makes an appropriation of a fund, which, if permitted to stand, would, by reason of the circumstances attending the transaction, work a wrong to another having an equity therein, and give him an unconscientious advantage over that other, the act will be regarded as what is called a constructive fraud in equity."

Section 82, Id.:

' "Equity will impress a trust contrary to the intention and will of a party where a fund has been obtained by him in violation of his duty to another. In order to raise this duty as the foundation of a constructive trust there need be neither a promise for the benefit of another, nor express fiduciary relations between them. It may be raised by representations, conduct, and the like, that have been relied on by another under such circumstances as create an equitable estoppel on one to pursue thereafter an opposite course for his own advantage. The conventional relation of trustee and cestui que trust, or other fiduciary relation, is not essential to the jurisdiction of a court of equity to declare and enforce a trust. * * *"

Section 83, Id.:

"It is a well-settled general rule that if one person obtains the legal title to property, not only by fraud, or by violation of confidence of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner."

See, also, 39 Cyc. 172; McNeill v. Gates, 41 Ark. 264.

The holder of the legal title to lands will in equity be charged as trustee where it was acquired by fraud or under such circumstances as to render it unequitable for him to retain it. Norton v. Meaders (Fed. Cas.) 4 Sawy. 603; Plummer v. Brown (Cal.) 12 Pac. 464; Johnson v. Gies, 9 Ga. 652; Carey v. Cincinnati Ry. Co., 5 Iowa, 557; Huxley v. Rice, 40 Mich. 73; Stephens v. Smith, 7 Mo. 610; Hendrix v. Nunn, 40 Tex. 141; Lakin v. Sierra Gold Mine Co.,

25 Fed. 337; Armour v. Lose, 33 Ala. 317; Perry on Trusts, 166; Ewing v. Ewing, 33 Okla. 414, 126 Pac. 811; Dike v. Martin, 85 Okla. 103, 204 Pac. 1106.

The facts in the case at bar bring it clearly within the established rule in the foregoing authorities, and the judgment of the trial court is in harmony with such authorities. This was not a suit to enforce an express trust, as plaintiffs in error contend; nor was it a suit upon a contract, as plaintiffs in error contend; nor was it the making of a contract by a court of equity, as plaintiffs in error contend; nor was it a suit under section 8463, Comp. Stat 1921. It was a suit by the victims of the conclusively established fraud to obtain relief from the effects of such fraud. The actions of the parties in the transaction and the effect of such actions may be properly summed up as follows:

Plaintiffs were induced to part with their money on the representation that defendants would contribute a like amount and that certain properties could be bought for what both parties thus contributed, and for no less. The facts were that the properties purchased cost far less than one-half of what defendants represented the cost would be; defendants contributed nothing except their efforts to carry out their intention to defraud; plaintiffs furnished not only all the purchase price, but many times more than the properties actually cost; the balance of their money, over and above the purchase price of the properties, was fraudulently converted to defendants' own use and purpose in effectuating their intended fraud. Plaintiffs were induced to believe the properties would be conveyed jointly to plaintiffs and defendants, but as a fact such properties were conveyed to defendants alone; plaintiffs were induced by similar misrepresentations to contribute the money which went to develop such oil and gas leases; that is, after defendants had obtained conveyances in their own name with plaintiffs' money for far less than plaintiffs had been led to believe such properties would cost, they not only embezzled and appropriated the balance of plaintiffs' money thus obtained, but, in addition, obtained several thousand dollars more from plaintiffs for the purpose of drilling wells on certain leases, under the promise that defendants would contribute a like amount, but, in fact, they contributed nothing.

However, when with plaintiffs' money defendants had brought in a paying well, they then organized the Cull Oil Company, and with such Cull Oil Company as a blind pro-

ceeded to market the products of the well and to appropriate the proceeds to their own benefit.

The picture which defendants' course of conduct created is reflected by the comments of the trial court at the close of the testimony:

"The conduct of M. E. Cull has been unspeakably corrupt. The conduct of Emmet Cull has been worse. After a receiver was appointed in this case he withheld and testified here that he paid certain claims which were submitted to him only and without consulting the receiver and without notifying anybody else who might have had an interest, reducing the balance from $3,015.12 to $1,100, and with astonishing temerity he says he took the $1,100 and deposited it to his own credit, used the money and turned the balance over to somebody else. That was embezzlement, for which he ought to be in the penitentiary.

"This is in some respects the dirtiest case I ever had anything to do with, and all the dirt comes from the Oklahoma Cull side of it, every single bit of it, and the Cull Oil Company, as organized and operating, was little if any better than a plain attempt at theft."

Of the foregoing statement it may suffice to say that no exception was taken thereto or presented here. Under such course of conduct equity could decree no interest to defendants, for in equity they had no interest; there was not a moment, from the conception of the plot to the institution of this suit, when defendants had a dollar of equitable interest in the properties involved; nor could equity decree them allowance for services rendered, everything that had been done having been done, not in behalf of plaintiffs, but for the purpose of effectuating defendants' fraud. In such case equity will decree the entire property and profits to those whose money purchased and produced it.

It could serve no purpose to discuss other contentions made by plaintiffs in error. The conclusions herein reached are forced upon us by the conduct of defendants and the governing principles of equity, and this, in our opinion, being an inevitable conclusion, they thereby dispose of the other contentions made. Judgment is affirmed.

JOHNSON, V. C. J., and KENNAMER, NICHOLSON, COCHRAN, and MASON, JJ., concur.